# EDWARD C. CARRINGTON, JR., *vs.* GEORGE G. TURNER.

*Authority of Officers of a Corporation to Accept the Collateral Security for a Note in Satisfaction of the Debt—Ratification by Corporation of Contract of Officers—Transfer of Note After Maturity—Evidence.*

An agreement by the officers of a corporation to accept shares of stock, pledged with it as security for a note, in satisfaction of the debt, is valid when they have authority to make such a contract, or it is subsequently ratified by the corporation; and if the note is not returned to the maker but is transferred after maturity to a third party, the latter is not entitled to recover on it against the maker.

The president and treasurer of a trust company, which was about to organize an insurance company, requested the defendant to assume the management of the insurance company upon his subscribing to a certain number of shares of its stock. It was agreed between the parties that the trust company would advance the subscription price upon the stock as collateral, and the defendant executed a demand collateral note for that amount to the trust company. Afterwards the president and treasurer of the trust company agreed to release defendant from his liability on the note upon his transferring the stock to that company. Defendant accordingly endorsed in blank the certificate of stock, and the officers of the company promised to return his collateral note, which was not done. Subsequently the defendant's stock was transferred to other parties, and money was borrowed on it by the trust company. Two years after its date defendant's note was assigned to the plaintiff, who brought this action on it. There was evidence that the president and treasurer of the trust company, with whom defendant dealt, managed all of the business of the trust company except that which was referred to a monthly meeting of the board of directors, and in one instance money had been borrowed on these shares of stock by the authority of the board of directors. *Held*, that evidence of these facts is admissible in the action on the note, and that from it the jury could find that the officers of the trust company had authority to accept from the defendant the shares of insurance stock in satisfaction of his note, and also that their transaction in so doing had been ratified by the trust company, and that, if they so find, the plaintiff took the note subject to the equities between the original parties and he is not entitled to recover in this action.

A corporation may confer upon its officers or agents larger powers than ordinarily belong to them, by holding them out to the public as posses-

sing such powers and by habitually permitting them to exercise the same.

Contracts made by the president, or other officers of a corporation, although invalid when entered into, may be made good by the ratification of the corporation.

Appeal from the Superior Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER' and JONES, JJ.

*Edward C. Carrington, Jr.*, and *Campbell Carrington*, for the appellant.

*J. Southgate Lemmon* and *C. Baker Clotworthy*, for the appellee.

SCHMUCKER, J., delivered the opinion of the Court.

The appellant sued the appellee in the Superior Court of Baltimore City to recover a balance claimed to be due upon a demand note drawn by the appellee to the order of The City Trust and Banking Company and by it endorsed. The appellee as defendant pleaded the general issue pleas and upon a trial of the issue joined thereon the verdict and judgment were in his favor and the plaintiff appealed.

The note in controversy appears in the record and is in the form of what is commonly known in banking circles as a collateral note. It is dated October 12th, 1900, and is for $1,875, payable on demand with interest from date, and states on its face that there is deposited with it as collateral security 150 shares of stock of the Security Fire Insurance Company. It contains the usual authority to the payee or its president or treasurer to sell the collateral on the non-payment of the note and to use, transfer or hypothecate it provided an equal amount of the same stock be returned on the payment of the note. There appears on the back of the note the endorsement of the payee and a credit as of May 12th, 1903, of $1,078.13 leaving a balance, after a proper adjustment of in-

terest, of $1,077.50 still due for the recovery of which this suit was instituted.

The substantial defense to the suit was that the trust company, the payee named in the note, had accepted a transfer of the 150 shares of stock in payment and satisfaction of the note.

There is evidence in the record tending to show the following facts. In November, 1899, the appellee, Turner, who was then in business for himself as an insurance broker, was sent for by Charles O'Donnell Lee, the president of the trust company and informed that that company was anxious to organize a local fire insurance company and was asked if he would accept the management of the insurance company about to be formed. After taking some time for reflection Turner agreed to accept the management of the insurance company if he were not called on to subscribe for too much of its stock, as he had not the money to take much of it. He finally agreed to take first 100 and afterwards 50 more shares, making 150 shares in all of the stock, upon the assurance of Mr. Lee that the trust company would carry the stock for him and would later on reduce his holdings of it down to 50 shares, and he was made manager of the company which was organized under the name of The Security Fire Insurance Company and began business about March 1st, 1900. Mr. Lee was president of both the trust company and the insurance company and the majority of the active directors of the latter company were also directors of the former one and the stock of the insurance company was issued at the office of the trust company.

On October 12th, 1900, Turner signed the note, on which the suit was brought, for the subscription price of the 150 shares of stock, but he never in fact received from the trust company or paid to the insurance company the $1,875, called for in the note or personally paid for the stock nor was the certificate for it ever delivered to or shown to him until the day he endorsed it over to the trust company as hereinafter mentioned. The note was drawn up by Mr. Kohler, the secretary and treasurer of the trust company, who retained it after it had been signed by Turner.

CARRINGTON *vs.* TURNER.

In February, 1901, the majority of the stock of the insurance company, including the shares held by Lee and Kohler and by the five directors of the trust company, was sold to J. Ramsay Barry an active insurance man who at once assumed control of the company's business.   Turner strongly complained to Lee and Kohler that he had been unfairly dealt with in being induced to give up his private business to take charge of the insurance company and then by the sale of the company left high and dry with 150 shares of its stock on his hands.   Lee and Kohler thereupon agreed that the Trust Company would take the 150 shares of insurance stock off Turner's hands in payment of his note and hold it as an investment and return him the note.   Kohler then produced the certificate for the 150 shares which was in the name of Turner and Lee requested Turner to endorse it, which he did by affixing his name to the blank assignment printed on its back.   He was then told that he was released and Kohler promised to return him his note in a few days as soon as it had been fixed upon the books, but he never did return it although he frequently promised to do so.   No demand was ever made on Turner for payment of the note or interest on it until December, 1902, nearly two years after he had transferred the stock in payment as he supposed of the note.   He replied to the demand for payment that he had already paid the note by the transfer of the stock, and he went to see Kohler about it who assured him that he was relieved of his obligation and again promised to return his note.

After the assignment of the stock by Turner to the Trust Company it caused the stock to be transferred into the name of its brokers, Stewart Lee & Co., and subsequently into the name of its treasurer and borrowed money on it as collateral and never had it retransferred into the name of Turner.   The certificate for the stock when pledged to the appellant for the $10,000 loaned by him to the Trust Company still stood in the treasurer's name.

There was also evidence tending to show that Lee and Kohler currently managed all of the business of the Trust

Company except that which was referred to the board of directors who met only once a month. Neither Lee nor Kohler were put upon the stand by the appellant to contradict the evidence already referred to or to give their version of the transactions with Turner in reference to the note and the stock.

On April 18th, 1903, Turner's note, then more than two years old, with the 150 shares of the Fire Insurance Company's stock attached was pledged, along with other securities, by the Trust Company which was then hard pressed for money to the appellant Carrington as collateral for a loan of $10,000 made to it by him on that date. At the trial of the case in the Court below the appellant who had thus acquired the note contended that he was entitled to be treated as a *bona fide* holder of it for value unaffected by any equities that might exist between the original parties to it, but on his brief and in his argument in this Court he voluntarily abandoned that contention and stated his willingness to assume that he took the note as a dishonored commercial instrument, subject to any equities, if such there were, between the original parties to it. His right to recover on the note must therefore be determined by the same tests which would be applicable to the trust company if it were the plaintiff in the case.

There are four exceptions in the record, three to rulings on the admissibility of testimony and one to the action of the Court below upon the prayers. The first three exceptions were taken to the admission of the testimony of the appellee as to the circumstances of the giving of the note and the subsequent alleged acceptance by the trust company through its president and secretary and treasurer of the insurance company's stock in satisfaction of the note. The abandonment by the appellant of the contention that he was entitled to be treated as a *bona fide* holder for value of the note unaffected by any equities greatly reduced the force and importance of these exceptions and they were not insisted upon in the argument of the appeal. There can be no question in the present aspect of the case that the testimony forming the basis of those exceptions was properly admitted.

The plaintiff in the Court below offered six prayers all of which the Court rejected and the defendant offered one prayer which the Court granted.    The plaintiff's first, fourth and sixth prayers were addressed to the proposition that his title to the note was that of an endorsee before maturity without notice of any infirmity in it and would therefore be inappropriate to the attitude now assumed by the appellant of admitting that he took the note as a dishonored instrument.    The plaintiff's fifth prayer, which presents his present contention, asks the Court "to instruct the jury that there is no legally sufficient evidence offered by the defendant in this suit that the note sued upon has been paid either to the original payee the City Trust & Banking Company or to the plaintiff, therefore they must find for the plaintiff under the pleadings in this case."    That prayer was properly rejected.

On his brief the appellant states his proposition thus: "Did Lee and Kohler as President and Secretary and Treasurer of the City Trust & Banking Company have the authority inherent in their office to make such a contract as is alleged by the defendant?"    That however is not the precise question presented by the record.    There is no direct evidence as to the nature and extent of the corporate powers of that corporation or the duties and authorities of its several officers before us.    The evidence in the case however shows the corporation to have been engaged, as modern trust companies often are, in promoting the creation and establishment of other corporations.    The testimony strongly indicates that it launched the Security Fire Insurance Company upon the community and assisted in floating its stock.    The witness Owens, who was with the Trust Company from start to finish and successively filled almost every office from runner to treasurer, testified without contradiction that Lee the president and Kohler the secretary and treasurer were the active managers of the company and transacted all of its business that was not referred to its board of directors who met but once a month.    Those two gentlemen conducted on behalf of the Trust Company the en-tire transaction with Turner touching his subscription for the

stock of the Insurance Company and the carrying of that stock for him.  After Turner had assigned his insurance stock to the Trust Company it caused that stock to be transferred to its own broker and afterwards to its treasurer and twice raised money on it for its own use, in one instance at least with the authority of its board of directors.   These facts especially when they were met with no explanation on the part of Lee or Kohler or the Trust Company were proper to be considered by the jury in determining whether in fact Lee and Kohler as officers of that company had authority to accept the 150 shares of insurance stock from Turner in satisfaction of his note and also whether their transactions in that connection were not subsequently adopted by the Trust Company.

The authorities collected with care upon the appellant's brief as to the nature and scope of the inherent powers of the president and cashier of a bank should not control this case, first because The City Trust and Banking Company is not presumed to be simply a bank in the ordinary sense of that term and secondly, because there is evidence in the case tending to show both authority by the agent and ratification by the principal in the transactions on which the appellee relied for his defense.   It is well settled that a corporation may confer upon its officers or agents larger powers than ordinarily belong to them by holding them out to the public as possessing such powers by habitually permitting them to exercise them.   *Eq. End. Ass'n.* v. *Fisher*, 71 Md 439; *Elysville Co.* v. *Okisko Co.*, 1 Md. Chy. 398, affirmed in 5 Md. 159; *Santa Clara Mining Co.* v. *Meredith*, 49 Md. 400; *Hadden* v. *Linville*, 86 Md. 231; 10 *Cyc.* 912, and cases there cited.   It is equally clear that contracts made by the president or other officer of a corporation although invalid when entered into may be made good by ratification.   *Santa Clara Mining Co.* v. *Meredith, supra*; 10 *Cyc.* 913–1076.

The defendant's prayer in effect asked the Court to instruct the jury that if they found that the defendant subscribed to the Insurance Company's stock at the solicitation of the Trust Company and gave it the note in question in payment for the

subscription with the right to hold the insurance stock as collateral security for the note and that subsequently the Trust Company through its president and treasurer agreed to take back the insurance stock in satisfaction of the note and that the defendant accepted the offer and assigned the certificate for the stock in blank and handed it to the said president or treasurer for the company, and that the plaintiff did not get the note until over two years after its date, they should find for the defendant. This prayer fairly stated the law of the case and was properly granted.

Finding no error in the rulings appealed from we will affirm the judgment.

*Judgment affirmed with costs.*

(Decided June 20th, 1905.)