REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2459

September Term, 2012

TOWER OAKS BOULEVARD, LLC

v.

BRENT W. PROCIDA, ET AL.
SUBSTITUTE TRUSTEES

Eyler, Deborah S., J.
Nazarian,
Salmon, James P.
          (Retired, Specially Assigned),

                    JJ.

Opinion by Eyler, Deborah S., J.

Filed: October 2, 2014

Tower Oaks Boulevard, LLC ("Tower Oaks"), the appellant, is a Virginia limited liability company that owned commercial real estate located at 2701 Tower Oaks Boulevard, in Rockville ("the Property"). 2701 Tower Oaks Boulevard Holdings, LLC ("TOB Holdings") held a deed of trust against the Property. Brent W. Procida and Laura S. Bouyea, the appellees, were appointed by TOB Holdings as substitute trustees under the deed of trust.

On October 22, 2012, in the Circuit Court for Montgomery County, the substitute trustees commenced an action against Tower Oaks to foreclose on the deed of trust for the Property. Tower Oaks filed a motion to stay and dismiss. The court granted a temporary stay but, after an evidentiary hearing, lifted the stay and denied the motion. Tower Oaks noted this interlocutory appeal, in which it asks whether the court's ruling was in error. We shall affirm the order.

## FACTS AND PROCEEDINGS

On March 19, 2007, TOB, Inc., an entity related to Tower Oaks, borrowed $9.1 million dollars from CWCapital, LLC ("CW"), and executed a promissory note guaranteed by Tower Oaks. (Unless it is necessary to do otherwise, we include TOB, Inc., when we reference Tower Oaks.) As security for the loan, Tower Oaks granted CW a deed of trust against the Property. The promissory note and the deed of trust were assigned several times to various lenders, the last of which was TOB Holdings.

The sole Member of Tower Oaks is Oak Plaza, LLC ("Oak Plaza"), a Maryland limited liability company. Oak Plaza's Operating Agreement states that its purpose is "to acquire and hold all outstanding membership interests in Tower Oaks LLC and, through

Tower Oaks LLC, to buy, sell, own, hold, develop, lease, manage, subdivide, and otherwise deal in and with the . . . Property and to do any and all things necessary, convenient, or incidental to that purpose."

Oak Plaza was formed on January 11, 2001. Its original Members were five siblings in the Buckingham family, who owned the following percentages of the company: Thomas and Daniel, 26% each; and Susan, Richard, and David, 16% each. Their father, John Buckingham, was designated the Manager of the company in the Operating Agreement, but was not a Member. An amendment to the Operating Agreement in February of 2007 made John a Member, with a 1% interest. The other Members' interests were reduced accordingly (Thomas and Daniel, 25.8% each; Susan, Richard, and David,15.8% each).

John also was the Manager of Tower Oaks under its Operating Agreement. For many years, he managed both companies. As we shall discuss below, the Tower Oaks Operating Agreement authorizes its Manager to carry out the business of the company but requires that "Major Decisions" be made "by written instrument of Members representing a majority of Membership Interests." Among these "Major Decisions" is any decision "to compromise, settle or submit to arbitration, and to institute, prosecute, and defend any and all actions in favor of or against [Tower Oaks] or relating to its businesses."

The Oak Plaza Operating Agreement, by contrast, gives the Manager extremely broad authority and discretion to act on behalf of the company and make decisions affecting it. That Operating Agreement contains a succession plan for the position of Manager. The plan

2

provides that John will act as Manager until his death or resignation, at which time Thomas, Daniel, and Elizabeth Buckingham (John's wife and the mother of the siblings) "shall jointly become the Manager (with all Manager decisions to thereafter be made by majority vote of these three (3) individuals, or in such other manner as they may among themselves determine to be appropriate.)." (The Manager of Oak Plaza need not be a Member.)

John developed dementia and became unable to function mentally. On January 13, 2011, the Circuit Court for Montgomery County issued an order appointing Elizabeth and David co-guardians of John's person and David guardian of his property, without limitation. David's guardianship authority included the power to act in John's stead as Manager of Tower Oaks and Manager of Oak Plaza.

Tower Oaks defaulted on its obligations under the promissory note, and in November of 2011, in the Circuit Court for Montgomery County, the substitute trustees, acting under the deed of trust held by TOB Holdings, commenced a foreclosure action against the Property (sometimes referred to as "the first foreclosure action"). The Property was sold at foreclosure on November 28, 2011. On December 19, 2011, David, with the agreement of Thomas, Richard, and Susan, retained the law firm of Gleason, Flynn, Emig and Fogleman ("GFEF") to defend Tower Oaks in the foreclosure action. Through GFEF, Tower Oaks filed exceptions to the foreclosure sale. Eventually, the substitute trustees agreed to set the sale aside and dismiss the foreclosure action without prejudice. On July 30, 2012, the court entered a consent order to that effect.

In the meantime, on December 7, 2011, Elizabeth died.

On August 14, 2012, David, acting as Manager of Oak Plaza and purportedly acting pursuant to a provision of the Oak Plaza Operating Agreement by which each Member makes the Manager his or her attorney-in-fact, signed a "Second Amendment to Operating Agreement of Oak Plaza, LLC" ("Second Amendment") individually, and on behalf of Thomas and Daniel, as their attorney-in-fact. Richard and Susan personally signed the Second Amendment. As written, the Second Amendment changed the line of managerial succession in the Oak Plaza Operating Agreement, removing Thomas and Daniel and replacing them with Richard, Susan, and David. Thomas and Daniel were not aware of the Second Amendment.

John died on October 17, 2012. Five days later, on October 22, 2012, the substitute trustees again brought a foreclosure action against Tower Oaks regarding the Property (sometimes referred to as "the second foreclosure action"). A sale of the Property was scheduled for November 13, 2012.

On November 9, 2012, Tower Oaks, represented by GFEF, filed a motion to stay and dismiss the second foreclosure action, under Rule 14-211(a). Such a motion "shall . . . state with particularity the factual and legal basis of each defense that the moving party has to the validity of the lien or the lien instrument or to the right of the plaintiff to foreclose in the pending action." *Id.* If the court grants a temporary stay, it shall then conduct a merits hearing, after which, unless it finds good cause to the contrary, it shall grant the motion if it

4

finds that the moving party has established that the lien or lien instrument is not valid *or* has established that the plaintiff did not have a right to foreclose. Md. Rule 14-211(e). The court shall deny the motion if it finds otherwise. *Id.*

In its motion, Tower Oaks "dispute[d] and challenge[d the] plaintiffs' right to foreclose against the Property." It did so based on allegations it had made in a pending civil action it had brought, together with TOB, Inc., Oak Plaza, and John (soon before his death), against TOB Holdings and prior holders of the promissory note ("the Lenders"), and Ronald Cohen Investments, Inc., and Ronald Cohen Management Company, both tenants of the Property ("the Tenants") ("the civil action"). In the civil action, Tower Oaks made claims for tortious interference with contractual relations, civil conspiracy, aiding and abetting, abuse of process, breach of contract, conversion, unjust enrichment, constructive fraud, and breach of an indemnification agreement. The gist of the allegations was that the Lenders, most prominently TOB Holdings, had conspired with the Tenants to have the Tenants not pay their rent for the Property, which would deprive Tower Oaks of the income necessary to make the payments on the promissory note secured by the Property, put the loan in default, and result in foreclosure.

Also on November 9, 2012, the substitute trustees filed an opposition to the motion to stay and dismiss. They stated that the total amount due on the loan, which had been accelerated upon default, was over $9.8 million. They pointed out that in the civil action Tower Oaks had acknowledged the promissory note and deed of trust, that payment on the

5

promissory note was in default, and that the loan had been accelerated. They emphasized that, pursuant to Rule 14-211(a)(3)(B), a motion to stay and dismiss a foreclosure action must "'state with particularity the factual and legal basis of each defense that the moving party has *to the validity of the lien* or the lien instrument *or to the right of the plaintiff to foreclose* in the pending action.'" (Emphasis in opposition filed by substitute trustees.) They argued that Tower Oaks's motion to stay and dismiss was legally deficient, as it did not present a defense to the validity of the lien *or* to the right of the lien holder to foreclose. The substitute trustees stated:

> The Complaint [in the civil action] seeks a money judgment, an accounting and the imposition of a constructive trust. It does not contest the validity of the lien or the right of TOB Holdings to foreclose. On the contrary, the Complaint [in the civil action] confirms the validity of the Deed of Trust and the default.

Still on that same day, the court held an expedited hearing on whether to issue a temporary stay of the upcoming foreclosure sale. The court granted the temporary stay, scheduled a merits hearing on the motion to stay and dismiss for January 3, 2013 (which later was moved to January 10, 2013), and ordered Tower Oaks to post a bond by 2:00 p.m. on November 13, 2012, in the amount of $95,030.52 "as security for payment of advertising fees, cancellation fees, and the December, 2012, and January, 2013 payments of principal and interest." Instead of posting a bond, Tower Oaks paid that sum of money into court.

On January 9, 2013, the day before the hearing, the substitute trustees filed a "trial brief," in which they argued for the first time that Tower Oaks's "appearance in th[e second

6

foreclosure] action" was "improper" because its defense in that action had not been authorized in accordance with the Operating Agreements of Tower Oaks and Oak Plaza. The substitute trustees reasoned as follows. Whether Tower Oaks would defend itself in the second foreclosure action was a "Major Decision" of that company that, according to its Operating Agreement, had to be made by a majority of its Members. Because Oak Plaza was the only Member in Tower Oaks, that "Major Decision" was its to make. Per Oak Plaza's Operating Agreement, the authority to make that decision rested with its Manager, not its Members. Also per the Oak Plaza Operating Agreement, upon John's death Thomas and Daniel became the Manager, jointly, of Oak Plaza. Therefore, only they had the authority to decide whether Tower Oaks should defend itself in the second foreclosure action, and, if so, to take steps to do so. Thomas and Daniel had not made any decision or taken any action on that issue, however. Only David, who, not being the Manager of Oak Plaza, did not have the power to make that decision and take action on it, had done so. Accordingly, the motion to stay and dismiss, filed at David's request, was not authorized by Tower Oaks and had to be denied.

The substitute trustees also argued, as they had at the hearing on the temporary stay, that Tower Oaks could not show that the lien or lien instrument were invalid or that TOB Holdings did not have the right to foreclose on the Property.

The hearing went forward on January 10, 2013, and largely was devoted to the issue of David's authority *vel non* to cause Tower Oaks to defend itself in the second foreclosure

7

action.  The substitute trustees argued, as explained above, that because Thomas and Daniel did not authorize the hiring of counsel or the filing of the motion to stay and dismiss, the court had no option but to deny the motion.  Mr. Fogleman (of GFEF), arguing on behalf of Tower Oaks, offered three reasons why David had been authorized to decide whether Tower Oaks would defend itself in the second foreclosure action and to take action to launch a defense: 1) David's guardianship power to act as Manager of Oak Plaza in John's place extended beyond the time of John's death, at least for a short period that encompassed the decision to defend Tower Oaks in the second foreclosure action (filed on October 22, 2012, five days after John died); 2) when GFEF was retained to represent Tower Oaks in the first foreclosure action, before John's death, the scope of the retention was to defend Tower Oaks in all foreclosure actions brought against it regarding the Property, which ultimately included the second foreclosure action; and 3) the Second Amendment to Oak Plaza's Operating Agreement removed Thomas and Daniel from the line of managerial succession and replaced them with David, Susan, and Richard, who in fact authorized the defense of Tower Oaks in the second foreclosure action.

The substitute trustees called Thomas and Daniel as witnesses.  Thomas testified that he had served as the Assistant Manager of Tower Oaks until around the time David was appointed guardian of John's property.  He did not sign the Second Amendment to the Oak Plaza Operating Agreement.  He had consented to and authorized GFEF's representing and defending Tower Oaks in the first foreclosure action, in November 2011, and had discussed

8

the matter with Mr. Fogleman then and in March of 2012. No one had discussed the second (pending) foreclosure action with him. When asked by the court whether he was authorizing David to proceed to take steps to defend Tower Oaks in the second foreclosure action, including hiring counsel, Thomas said he would "give [his] permission" to David to "do this." Thomas further testified that he had assumed that the second foreclosure action was a "continuation" and "followup" to the first foreclosure action, involving the same Property and the same loan. It was his view at the time of the hearing (January 10, 2013), as it had been in the Fall of 2011, that it was a "good idea" for Tower Oaks to contest the foreclosure action.

Daniel testified that he had had no involvement in any matter having to do with the Property since 2009. He was not aware of the first foreclosure action and sale (later vacated) in 2011, and had not been informed of any decisions made or actions taken by David, or by anyone, regarding Tower Oaks's defense to that foreclosure action or to the second (pending) foreclosure action. He did not sign the Second Amendment to the Oak Plaza Operating Agreement, regarding the succession plan. As of the present (January 10, 2013), he did not have sufficient information to say whether he would have authorized Tower Oaks's defense in the second (pending) foreclosure action had he been asked.

Mr. Fogleman read into the record the engagement letter of December 19, 2011, between GFEF and Tower Oaks. The letter was signed by David. (We shall discuss its contents *infra*.) David then was called as a witness. He testified, in pertinent part, that in the

Fall of 2011, when he was acting as guardian of John's property and therefore Manager of Oak Plaza and Tower Oaks, he had engaged GFEF to defend Tower Oaks in the first foreclosure action, which was then pending, and in any future foreclosure action concerning the Property.

David further testified that Daniel had not communicated any inclination against defending Tower Oaks in the second foreclosure action or against retaining GFEF to represent Tower Oaks in that action. David stated that, when it came time to decide how to defend Tower Oaks in the second foreclosure action, he consulted with Mr. Fogleman and executed the affidavit attached to the motion to stay and dismiss. He had been aware in August of 2012 (before John's death) that the substitute trustees were planning to file a second foreclosure action against the Property. Mr. Procida, one of the substitute trustees, had told him then that a foreclosure sale of the Property likely would be scheduled for a date in September of 2012. According to David, that was when he decided in favor of defending Tower Oaks in the second foreclosure action, even though it had not yet been filed, and he made that decision by exercising his authority as Manager of Oak Plaza, in John's stead.

The court ruled from the bench. It determined that, under Md. Code (2001, 2011 Repl. Vol.), sections 13-220 and 13-221 of the Estates and Trusts Article, David's guardianship of John's property ceased upon John's death, and after that date David had no power to act as Manager of Oak Plaza. It further determined that the engagement letter did not change this, and did not authorize a defense of Tower Oaks in an action commenced after

John's death. The court also found that the Second Amendment to Oak Plaza's Operating Agreement, purporting to change the managerial succession plan for that company, did not come "close to complying with the law" because the Operating Agreement required an amendment of that significance to be made by the Members of Oak Plaza personally, not by means of a power of attorney. Because Thomas and Daniel did not give their consent to amend the Operating Agreement to change the line of managerial succession, no change was effected. Upon John's death, they became the Manager of Oak Plaza, jointly (Elizabeth having already died).

Although it had ruled that the motion to stay and dismiss had to be denied because it was not authorized by Tower Oaks, the court discussed the substance of the motion, and whether the facts alleged in the civil action, if true, could establish that TOB Holdings, and through it the substitute trustees, did not have the right to foreclose on the Property. The judge observed:

> [T]he defendant in the foreclosure action has a preexisting duty to pay that money, and if there was some reason that it was deprived of its funds, it seems to me that an action for damages might lie -- I don't suggest that it does or doesn't -- but that would be the appropriate remedy for someone who says, "I couldn't pay because basically you took my money away."
>     And I recognize this is an equitable action and the unclean hands doctrine applies. I'm still reluctant to conclude that the relief that a person of, whose property was being foreclosed would have would be to say, you know, "You've caused this," because I don't think the language of [Rule] 14-211(a)(3)(B) refers to that. I think it rather refers to the legal right of the plaintiff to foreclose, and whether he was not the proper note-holder or there was some imperfection in the deed . . . , I think that's what that refers to.

The judge further commented: "I don't really think, even assuming that [Tower Oaks] put on its case here and I said, 'You know what, the reason you didn't pay this was because they deprived you of your ability to do so,' I don't think that falls within the provisions of the rule. I don't think that's what is contemplated by the rule."

That same day, the court issued and docketed an order lifting the temporary stay that had been entered on November 9, 2012. On January 22, 2013, Tower Oaks filed a motion to alter, amend, or revise judgment, and request for hearing, which was denied by order entered on January 25, 2013. On February 6, 2013, Tower Oaks filed a notice of appeal.

On February 21, 2013, the court issued and docketed an order denying the motion to stay and to dismiss "[f]or the reasons stated in the court's opinion delivered from the bench on January 10, 2013." On February 28, 2013, Tower Oaks filed a second notice of appeal.

In the meantime, on February 12, 2013, the substitute trustees filed in the circuit court a motion to dismiss appeal, to which Tower Oaks filed an opposition. On April 11, 2013, the court issued an order, entered on April 16, 2013, denying the motion.[1]

During the pendency of this appeal, the second foreclosure action against the Property has proceeded in the circuit court, with Tower Oaks defending the action, through GFEF. On February 8, 2013, the Property was sold. TOB Holdings "bought in" at a purchase price

---

[1] As noted, this is an appeal from an interlocutory order denying a motion to stay and dismiss. A stay is in the nature of an injunction; and an order refusing to grant an injunction is appealable, even though it is interlocutory, under Md. Code (1974, 2013 Repl. Vol.), section 12-303(3)(iii) of the Courts and Judicial Proceedings Article ("CJP"). *See also Fishman v. Murphy*, 433 Md. 534, 540 (2013).

of $6 million. The substitute trustees filed a report of sale on March 11, 2013. On May 28, 2013, Tower Oaks filed exceptions. The exceptions were denied and on September 4, 2013, the court issued an order ratifying the sale. Tower Oaks filed a notice of appeal from that order. That appeal is pending in this Court.

Also during the pendency of this appeal, the claims in the civil action were decided in part before trial by the court and in part by a jury and the court at trial. The court granted summary judgment in favor of the Lenders on the claims against them. The claims against the Tenants were tried to a jury, which found in favor of Tower Oaks and awarded it significant compensatory damages, including sums for lost rent. After an evidentiary hearing, the court awarded Tower Oaks punitive damages against the Tenants. Recently, the Tenants noted an appeal in this Court.

We shall include additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I.

### Motions to Dismiss for Mootness

In their brief, the substitute trustees argue that this appeal must be dismissed as moot because the court denied the motion to stay and dismiss on two grounds, and in its brief Tower Oaks only challenges one ground, making no mention of the other. Specifically, the substitute trustees maintain that the court denied the motion because it was filed without authorization *and* because Tower Oaks did not present legally sufficient evidence to support

13

a finding that TOB Holdings did not have a right to foreclose. Yet, Tower Oaks only has challenged the authority ruling on appeal.

In a reply brief, Tower Oaks argues that the court denied the motion to stay and dismiss on the ground that it was filed without authorization, and that the court's observations about the unclean hands doctrine and the type of evidence necessary to show that the lien holder does not have a right to foreclose were not a separate, independent ground for its ruling. Thus, the only ruling subject to challenge on appeal was the one determining that Tower Oaks's defense, including its motion to stay and dismiss, had not been authorized and therefore was of no effect. Tower Oaks also argues that, if the court ruled on two separate, independent grounds, both rulings were in error.

After briefs were filed but before oral argument in this Court, the substitute trustees filed another motion to dismiss the appeal, also for mootness, but on a different theory. As we have explained, Tower Oaks had argued that the court should grant the motion to stay and dismiss because, under the unclean hands doctrine, TOB Holdings had lost its right to foreclose by engaging in wrongful conduct that resulted in Tower Oaks's defaulting on the promissory note. Almost a year after the motion to stay and dismiss was denied, the court in the civil action granted summary judgment in favor of the Lenders, including TOB Holdings. The substitute trustees argue that because the claim of wrongful conduct against TOB Holdings in the civil action was essential to Tower Oaks's assertion that TOB Holdings did not have a right to foreclose, TOB Holdings' victory in the civil action eliminated Tower

14

Oaks's "no right to foreclose" argument. Therefore, Tower Oaks was left with no basis on which to challenge TOB Holdings' right to foreclose, and, even if authorized to file the motion to stay and dismiss, had no basis for it.

Maryland law makes clear that "[a] case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy." *Coburn v. Coburn*, 342 Md. 244, 250 (1996). With this definition in mind, we shall deny the motions to dismiss this appeal on both theories.

There is no theory advanced by the substitute trustees that would warrant ***dismissal*** of this appeal for mootness. Their arguments, if viable, would warrant an ***affirmance*** of the court's order. The law of appellate review establishes that, "'[w]hen a separate and independent ground that supports a judgment is not challenged on appeal, the appellate court must affirm.'" *Bailiff v. Woolman*, 169 Md. App. 646, 653 (2006) (quoting *San Antonio Press, Inc. v. Custom Bilt Machinery*, 852 S.W. 2d 64, 65 (Tex. Ct. App. 1993)). Here, if Tower Oaks failed to challenge both grounds on which the court denied the motion to stay, and the grounds were separate and independent, we would have no choice but to affirm the order denying the motion to stay and dismiss on the ground not challenged. That is not the situation here, however, because the two grounds were not separate and independent. The court denied the motion on the ground that Tower Oaks had not been authorized to take action to defend itself in the second foreclosure action, making the motion to stay and dismiss ineffective. The court then went on to address the merits of the motion to stay and

15

dismiss, opining that *if the motion to stay and dismiss had been authorized*, the wrongful conduct by TOB Holdings that resulted in the Tenants not paying rent and Tower Oaks not having funds to pay the note would not eliminate TOB Holdings' right to foreclose, as a matter of law or under the unclean hands doctrine.

The court's "ruling" about the merits of the motion to stay and dismiss was not a separate and independent basis on which it denied the motion. At most, it was a contingent ruling. The court found that Tower Oaks filed an unauthorized and therefore ineffective motion to stay and dismiss; the consequence of that finding is that any "ruling" on the merits of the motion is immaterial. It is not a separate basis for denying the motion, independent of the lack of authority ruling. If this Court were to decide on appeal that the circuit court was correct in its lack of authority ruling, that would result in an affirmance, with the "ruling" on the merits remaining inconsequential. Even if this Court were to decide on appeal that the circuit court had erred in its lack of authority ruling, the "ruling" on the merits only would take on meaning with respect to whether the error was prejudicial. In that case, the "ruling" on the merits, if itself correct, would enable this Court to conclude that the motion to stay and dismiss would have to have been denied, even absent the authority ruling. In neither situation are the two rulings separate and independent and in neither situation has there ceased to be a live controversy between the parties so that the case has become moot.

Regardless of the court's "ruling" on the merits of the motion to stay and dismiss, and regardless of the resolution of the claims against TOB Holdings in the civil action in its

16

favor, there is a controversy between the parties over whether the court erred in finding that Tower Oaks lacked authority to defend itself in the second foreclosure action, and this Court has the power to provide an effective remedy respecting that controversy. It is worth noting that the lack of authority ruling has affected subsequent rulings in the second foreclosure action. For example, the court denied Tower Oaks's exceptions to the foreclosure sale and ratified the sale on the ground that the lack of authority ruling made in January 2013 continued to apply for the life of the case, and therefore Tower Oaks had no authority to file exceptions to the sale. As mentioned, these later rulings now are being challenged on appeal. The decision in this appeal about authority *vel non* could affect the outcome of that appeal.

For all these reasons, this case is not moot, and this appeal will not be dismissed for mootness.[2]

## II.

### Denial of Motion to Stay and Dismiss for Lack of Authority

The parties repeat many of the arguments they advanced below about whether Tower Oaks's defense in the second foreclosure action, including its filing of the motion to stay and dismiss, was or was not authorized. In particular, Tower Oaks maintains that David had authority to decide that Tower Oaks would defend itself and to take action to accomplish that purpose because: 1) he retained guardianship power after John's death to act as Oak Plaza's

---

[2]The substitute trustees filed a motion to suspend an order of the circuit court staying ratification of the foreclosure sale, and seeking payment of fees and costs. We exercise our discretion to deny the motion.

17

Manager for a brief period, during which the decision whether Tower Oaks would defend against the second foreclosure action was made; 2) before John's death, David effectively "pre-authorized" GFEF to defend Tower Oaks against all future foreclosure actions involving the Property; or 3) by virtue of the Second Amendment to the Oak Plaza Operating Agreement, upon John's death, David, Richard, and Susan became the Manager, jointly, of Oak Plaza, and therefore had authority to decide whether Tower Oaks would defend itself in the second foreclosure action. (David, Susan, and Richard all agreed that Tower Oaks should defend itself). Tower Oaks also argues that Thomas and Daniel ratified David's decision to defend Tower Oaks in the second foreclosure action and to have GFEF represent Tower Oaks in that action (as it had done in the first foreclosure action).

The substitute trustees respond that the court correctly rejected these arguments, and that other arguments, such as ratification, have no factual basis. Therefore, under the managerial line of succession provision in the Oak Plaza Operating Agreement, Thomas and Daniel were the Manager of Oak Plaza, which was the sole Member of Tower Oaks when the second foreclosure action was initiated, and they had sole authority to decide for Oak Plaza, and hence for Tower Oaks, whether to defend Tower Oaks in that action. David's actions in that regard were unauthorized.

The circuit court's decision on the authority issue was based in part upon its interpretation of the Operating Agreements for Tower Oaks and Oak Plaza, and relevant statutory law. These are legal decisions that we review *de novo*. *See Moscarillo v. Prof'l*

18

*Risk Mgmt. Servs., Inc.*, 169 Md. App. 137, 145 (2006). We also review mixed questions of law and fact by a circuit court *de novo*. *See Winder v. State*, 362 Md. 275, 310-11 (2001). Finally, we defer to the court's factual findings, unless they are clearly erroneous, but give no deference to its purely legal conclusions. *Fischbach v. Fischbach*, 187 Md. App. 51, 88 (2009).

It is important to keep in mind that the authority issue in this case is not about an *ultra vires* act of a business entity. An act of a corporation is *ultra vires* if it is beyond the scope of the express or implied powers conferred upon the corporation by statute or by its charter, articles of incorporation, or by-laws. 19 C.J.S. *Corporations* § 673, (2007); *Day v. Nu-Day Partnership, LLLP*, 711 S.E.2d 689, 690-91 (Ga. 2011); *Rowe v. Franklin County*, 349 S.E.2d 65, 68-69 (N.C. 1986). By contrast,

> [i]f a corporation's act is within the corporate powers, but is performed without authority or in an unauthorized manner, the act is not ultra vires. Thus, for example, if a corporation has authority under statute and charter to enter into a transaction, the fact that an agent of the corporation purports to bind the corporation without permission of the corporation does not make the transaction ultra vires, but merely makes the transaction one that the corporation has not authorized, even though other such acts by proper corporate agents would be binding on the corporation.
> Acts which the corporation may accomplish lawfully, but which it has undertaken to accomplish in an inappropriate manner are voidable and may be cured.

19 C.J.S. *Corporations* § 675. The latter is what we are confronted with here. Tower Oaks, through Oak Plaza, had the authority to defend the second foreclosure action against it. It did not act beyond its power in doing so. The question is whether David was authorized to

19

make the decision to defend Tower Oaks in that action and to carry out that decision. For the reasons we shall explain, we agree with the circuit court that David was not so authorized.

To review briefly, the Tower Oaks Operating Agreement provides that the decision whether to defend Tower Oaks in a lawsuit must be made by a majority of the Members, which means it must be made by Oak Plaza, the only Member of Tower Oaks. The broad powers of the Manager of Oak Plaza are set forth in Section 5.1.2 of its Operating Agreement, which states, in relevant part:

> The Manager shall have full, exclusive, and complete discretion, power, and authority, subject to the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company [defined to mean Oak Plaza] for all the purposes herein stated, and to make all decisions affecting such business and affairs, ***including, without limitation***, for Company purposes, the power to . . .
>
> 5.1.2.11. ***enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company.***

(Emphasis added.)

The Oak Plaza Operating Agreement not only grants the Manager expansive authority to operate the business but also limits the authority of its Members to act on the company's behalf. Section 5.1.4.1 provides: "No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member."

## 1. *Residual Guardianship Authority*

As noted, John died on October 17, 2012, and the second foreclosure action was filed on October 22, 2012. Tower Oaks maintains that David's power to act in John's place as the Manager of Oak Plaza still was in effect when the second foreclosure action was filed. It points out that immediate termination would be inconsistent with ET section 13-221of the Estates and Trusts Article ("ET"), which sets forth provisions for terminating a guardianship *after* the death of the ward, and which requires the guardian to deal with the ward's estate under laws that apply to a fiduciary.

ET section 13-220, entitled "Termination of appointment of guardian" states, in pertinent part, that "[t]he appointment of a guardian terminates when the guardianship terminates under § 13-221 of this subtitle." ET section 13-221, in turn states:

> (a) *Petition to terminate.* – The minor or disabled person, his personal representative, the guardian, or any other interested person may petition the court to terminate the guardianship proceedings.
> (b) *Cause for termination.* – A guardianship proceeding shall terminate upon: . . . (2) The death or presumptive death of the minor or disabled person; . . .
> ( c) *Rights and procedures.* – Termination and final distribution of the estate of a former minor or disabled person shall be made in compliance with the provisions of the Maryland Rules, applying to a fiduciary.

The relevant rule that applies to a fiduciary is Rule 10-710. (Chapter 700 is entitled "Fiduciary Estates Including Guardianships of the Property.") It states, in relevant part,

> **Termination of a fiduciary estate – Final distribution.**
>
> (a) **Cause for termination.** Grounds for the termination of a fiduciary estate shall include: . . . (6) the death of the minor or disabled person . . . .

(b) **Time for filing – Who may file.** Within 45 days after the fiduciary discovers that the grounds for termination exist, the fiduciary shall file a petition requesting the court to terminate the estate.

Tower Oaks asserts that the guardianship necessarily must continue during this forty-five day period, at least until a personal representative of the estate is appointed. Therefore, for some period of time after John's death, David retained the authority granted to him by the guardianship order to make management decisions for Oak Plaza, including the decision to defend Tower Oaks against the second foreclosure action.

This argument lacks merit because the relevant statutory language, quoted above, only addresses the guardian's role in "wrapping up" the deceased ward's estate; it does not provide generally for a continuation of the guardianship authority the guardian possessed while the ward was living to a period after the ward's death. In *Battley v. Banks*, 177 Md. App. 638, 651 (2007), we explained,

> [W]hen a ward dies, all the ward's property becomes the assets of his decedent estate, and where a personal representative has been appointed to the ward's estate, title vests immediately, in that person. In short, the ward's assets, upon his death, become the assets of his decedent estate. *The guardian's duties are then reduced to filing a petition to terminate the estate together with a final accounting and proposed final distribution of the ward's property*, pursuant to Rule 10–710(b) and ET § 13–221, and thereafter to transfer to the personal representative all of the decedent's property, as required by ET § 1–301(a).

(Emphasis added.) In *Battley*, we reversed a circuit court's order allowing a guardian to pay himself a commission from the guardianship bank account after the ward's death. Because all of a ward's assets became the assets of the ward's estate upon the ward's death, the guardian was required to immediately turn over all assets to the personal representative of

22

the estate. A court later could approve guardianship fees to be paid from that estate, but the guardian could not pay himself by using his former guardianship authority.

The holding in *Battley* makes clear that a guardian's role after the death of the ward is circumscribed, and differs from the role of surrogate decision-maker the guardian occupies while the ward is alive. Nothing in the law pertaining to guardianships provides for the kind of post-death residual decision-making authority asserted by Tower Oaks. It would be illogical for a guardian to retain such decision-making authority after the death of the person on whose behalf such decisions are made. Indeed, this is the very reason that governing business documents, such as the Oak Plaza Operating Agreement in this case, include succession plans. Here, Oak Plaza's succession plan for the role of Manager was triggered upon John's death. As we shall explain, *infra*, by operation of the Oak Plaza Operating Agreement, Thomas and Daniel became the Manager upon John's death, automatically. Thus, there was no gap in time, after John's death and before a new Manager was appointed, in which, if David did not continue to exercise some residual guardianship power, there would be no one to make the decisions the Manager is empowered to make.[3]

### 2. *"Pre-authorization" for Tower Oaks to Defend against the Second Foreclosure Action.*

---

[3]In a non-residential foreclosure, the mortgagor has 15 days from the date it becomes aware of the action to file a motion to stay and dismiss. Md. Rule 14-211(a)(2)(B). That 15 days was ample time for Thomas and Daniel, the Manager as of October 17, 2012, to decide whether Tower Oaks should defend itself. There was no emergency. In fact, the motion to stay and dismiss was timely filed on November 9, 2012, more than three weeks after John died.

23

Tower Oaks contends its defense of the second foreclosure action properly was authorized by David, in his role as Manager of Tower Oaks and Oak Plaza, before John died. It makes two supporting arguments.

First, in the engagement letter of December 19, 2011, in which GFEF was retained, David "pre-authorized" GFEF to defend Tower Oaks in a future foreclosure action against the Property. The letter states:

> We, the undersigned, do hereby retain and employ the law firm of Gleason, Flynn, Emig & Fogleman, Chartered, to represent Tower Oaks Boulevard, LLC, Oak Plaza, LLC, TOB, Inc., and John D. Buckingham in regard to . . . *the foreclosure proceedings* against the real property located at 2701 Tower Oaks Boulevard, Rockville, Maryland 20852.

(Emphasis added.) According to Tower Oaks, the use of the plural "foreclosure proceedings" shows that, by signing the letter, David was authorizing GFEF to defend Tower Oaks in *all* foreclosure proceedings affecting the Property, *i.e.*, the first foreclosure action, which was brought in November 2011, and was pending when the engagement letter was signed, and any foreclosure action that might be brought against Tower Oaks in the future, pertaining to the Property.

Second, in August of 2012, before John died. David made the decision in his guardianship capacity to defend Tower Oaks against the second foreclosure action that later was filed on October 22, 2012, which turned out to be after John's death. His decision in August of 2012 was prompted by an encounter with one of the substitute trustees who told

24

him that a foreclosure sale of the Property was going to be scheduled for "sometime in September" 2012.

A foreclosure action is commenced by filing an order to docket. *See* Md. Rule 14-203(b). The first foreclosure action was initiated in November of 2011; and the letter engaging GFEF to represent Tower Oaks in defense of that action is dated December 19, 2011. Nothing in the engagement letter suggests that it was known at that time that the then-pending foreclosure action would be one of a series of such actions by the substitute trustees against Tower Oaks relating to the Property. The ordinary legal meaning of "proceedings" as the word is used in that letter is "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment. . . .; [a]n act or step that is part of a larger action." BLACK'S LAW DICTIONARY (10th ed. 2014). Thus, "proceedings" in the December 19, 2011 letter meant the various stages of the foreclosure action in which GFEF was being retained to represent Tower Oaks; it did not mean another foreclosure action that might follow, even involving the Property.

The meaning of "proceedings" as we have explained it is consistent with David's testimony that, in August of 2012, after the first foreclosure action had ended and before the second one was commenced, he decided to retain GFEF to represent Tower Oaks in the second foreclosure action. If the letter meant what Tower Oaks now argues it meant, there would have been no reason for David to have had that thought in August of 2012. He already would have been operating with the understanding that GFEF had been retained to represent

25

Tower Oaks in the foreclosure action that was going to be filed in the Fall of 2012.

Moreover, the decision David claims he made in August of 2012 was premature. The decision to mount a defense in an action only can be made once the action has commenced, when there is something to defend. Here, there was nothing to defend until October 22, 2012. By then, John had died, David no longer had guardianship authority to act as Manager of Oak Plaza, and, for the reasons we shall discuss, only Thomas and Daniel had the authority to decide whether to defend Tower Oaks.[4]

### 3. *Managerial Succession Under Oak Plaza Operating Agreement*

The Oak Plaza Operating Agreement designates John Buckingham as its "initial Manager," and provides for succession as follows:

> 5.1.1. *Manager*. The Company shall be managed by a Manager, who need not be a Member. John D. Buckingham is hereby designated to serve as the initial Manager. He shall continue to serve in that capacity until his death or resignation. Upon the death or resignation of John D. Buckingham, Elizabeth S. Buckingham, Thomas A. Buckingham and J. Daniel Buckingham, Jr. shall jointly become the Manager (with all Manager decisions to thereafter be made by majority vote of these three (3) individuals, or in such other manner as they may among themselves determine to be appropriate).

All five Buckingham siblings, as well as John (as Manager), signed the Operating Agreement, and the February 2007 amendment to the Operating Agreement.

---

[4]Even if David could have pre-authorized a defense for Tower Oaks before the second foreclosure action was filed, that decision would have had to have been ratified subsequently by Thomas and Daniel. As we explain, *infra*, the evidence at the January 10, 2013 hearing could not support a finding of ratification.

On August 14, 2012, a little more than two months before John died, David executed a "Second Amendment to Operating Agreement of Oak Plaza, LLC" in which he sought to change the succession provision. As relevant, the Second Amendment reads as follows:

> Upon the death or resignation of John D. Buckingham, Richard D. Buckingham, Susan E. Buckingham, and David T. Buckingham shall jointly become the Manager (with all Manager decisions to thereafter be made by majority vote of these three (3) individuals, or in such other manner as they among themselves determine to be appropriate).

The Second Amendment is signed by Richard, Susan, and David. David also signed four times on behalf of John under his guardianship authority: on behalf of John as a Member of Oak Plaza; on behalf of John as Manager of Oak Plaza; on behalf of John as attorney-in-fact for Thomas; and on behalf of John as attorney-in-fact for Daniel. As noted, neither Thomas nor Daniel personally signed the second amendment.

Section 9.4 of the Oak Plaza Operating Agreement states with respect to amendments to the Operating Agreement,

> *Complete and Final Agreement.* This Agreement constitutes the complete and exclusive statement of the agreement among the Members. . . . ***Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members*[.]**

(Emphasis added.) Thus, any amendment to the Operating Agreement requires the written consent of all of Oak Plaza's Members, unless there is an express provision in the Operating Agreement to the contrary.[5]

---

[5]This is consistent with the Maryland Limited Liability Company Act, Md. Code
(continued...)

27

Tower Oaks argues that section 5.6 of the Oak Plaza Operating Agreement is such an express provision to the contrary, under which the Manager is authorized to amend the Operating Agreement without the written consent of the Members; and therefore the Second Amendment is valid and effective. Section 5.6 states, in pertinent part:

> *Grant of Power.* Each Member constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file: . . . all documents (including amendments to articles of organization) which the Attorney-in-Fact deems appropriate to reflect any amendment, change, or modification of this Agreement. . . .

The substitute trustees respond that the plain language of this provision allows the Manager to use his power of attorney to *execute* "conforming documents made necessary by a properly executed amendment to the Operating Agreement," and not to *amend* the Operating Agreement itself.

We agree with the substitute trustees. Section 5.6 limits the kinds of documents the Manager may execute as attorney-in-fact for Oak Plaza's Members. The plain language of the section allows the Manager to use his power of attorney to execute documents that "*reflect* any amendment, change, or modification of [the Operating] Agreement" (emphasis added). The documents the Manager properly may sign as attorney-in-fact for Oak Plaza's

[5](...continued)
(1975, 2007 Repl. Vol., 2013 Supp.), section 4A-402(c)(1) of the Corporations and Associations Article ("CA") ("If the operating agreement does not provide for the method by which the operating agreement may be amended, then all of the members must agree to any amendment of the operating agreement.").

Members are those that are pursuant to – and logically subsequent to – an amendment to the Operating Agreement. Section 5.6 does not grant the Manager the power to amend the Operating Agreement. Accordingly, section 9.4 of the Operating Agreement controls, and requires the written consent of all Members of Oak Plaza to amend the Operating Agreement. Thomas and Daniel -- two Members -- did not consent to the Second Amendment. For that reason, it was not valid or effective.

Upon John's death on October 17, 2012, the succession provision in the Oak Plaza Operating Agreement was triggered and (because Elizabeth no longer was alive) Thomas and Daniel became the company's Manager, jointly, with the "full, exclusive, and complete discretion, power, and authority, subject to the requirements of applicable law, to manage, control, administer, and operate the business and affairs" of the company, and "to make all decisions affecting such business and affairs." That authority includes "without limitation" the power to "enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes" of Oak Plaza.

As already mentioned, the purpose of Oak Plaza, as stated in section 2.3 of its Operating Agreement, is to hold all membership interests in Tower Oak and "to buy, sell, own, hold, develop, lease, manage, subdivide, and otherwise deal in and with" the Property "and to do any and all things necessary, convenient, or incidental to that purpose." The decision whether to defend Tower Oaks in a foreclosure action that could result in the sale of the single Property that Tower Oaks owns and the very Property that Oak Plaza is to

29

manage, hold, and otherwise "deal with" is central to Oak Plaza's purpose, and so is within the authority of its Manager to make. Accordingly, when the second foreclosure action was commenced on October 22, 2012, Thomas and Daniel, as the Manager of Oak Plaza, had the exclusive authority to decide whether to defend Tower Oaks in that action and, if so, to take steps to do so. David had no such authority, and the court correctly ruled that his decisions and actions in that regard were not effective.

## 4. *Ratification*.

Finally, Tower Oaks contends that, if David acted without authority in acting to defend Tower Oaks in the second foreclosure action, the facts adduced at the evidentiary hearing established that Thomas and Daniel ratified David's actions.

Ratification is a longstanding doctrine of agency law that may apply to acts and transactions in a number of settings, including business settings. Under the doctrine, when an actual or apparent agent purporting to act on behalf of a principal did not have authority to act, the principal later may approve the unauthorized act. *In re Uwimana*, 274 F.3d 806, 812 (4th Cir. 2001) (applying Maryland law); *Bruffey Contracting Co., Inc. v. Burroughs Corp.*, 522 F. Supp. 769, 774-75 (D. Md. 1981). Thus, the act, although done without authority, becomes binding on the principal who subsequently approves it. *Bannon v. Warfield*, 42 Md. 22, 42 (1875). *See e.g. Webb v. Duvall,* 177 Md. 592 (1940) (corporation may ratify and render binding originally unauthorized acts and contracts of officers and other agents); *Carrington v. Turner*, 101 Md. 437 (1905) (contract by president or officer of a

30

corporation who did not have authority to enter into it, and therefore was invalid when made, can be ratified by the corporation and made good). The ratified act is effective as if it had been performed with authority to begin with, and therefore relates back in time. *Lee v. Pfeifer*, 916 F. Supp. 501, 508 (D. Md. 1996); 19 C.J.S., *Corporations* § 707. When a corporate officer has acted without authority in bringing a suit, the corporation may ratify the action, which is the equivalent of the officer's having had original authority to bring the lawsuit. Fletcher *Cyclopedia of the Law of Corporations*, Vol. 9, (2008 Rev'd Vol.), § 4216 ("Fletcher").

For a corporation to ratify an unauthorized act of its actual or apparent agent, it must have had knowledge of all the material facts concerning the act being ratified and affecting the corporation, at the time of ratification. *Linden Homes, Inc. v. Larkin*, 231 Md. 566, 570 (1963); *Tricat Indus., Inc. v. Harper,* 131 Md. App. 89 (2000) (evidence legally insufficient to show that board of directors ratified employment offered by officer to employee in absence of evidence of knowledge of material facts on part of board)*; Yost v. Early*, 87 Md. App. 364, 382 (1991). An inference that the principal had knowledge may be drawn from the existence of such information as would put a person of ordinary intelligence on notice of the material facts of the transaction being ratified. *Bakery and Confectionary Union and Industry Int'l Pension Fund v. New World Pasta Co.*, 309 F. Supp. 2d 716, 729-30 (D. Md. 2004).

Ratification may be undertaken in a number of ways that evidence an intention to ratify. A corporation may ratify an unauthorized act expressly or by implication. *Webb,* 177

31

Md. at 599. When done expressly, and when the corporate charter or other governing document or statute requires approval in a particular manner, the ratification must be done in that manner. 19 C.J.S. *Corporations* § 708. Ratification of an unauthorized act, although not express, may be implied from words, acts, or conduct on the part of the principal that reasonably indicate a desire to affirm the unauthorized act. *In re Uwimana,* 274 F. 3d at 812-13; *Progressive Cas. Ins. Co. v. Ehrhardt*, 69 Md. App. 431, 442 (1986). *See also* 19 C.J.S. *Corporations* § 709 ("[r]atification may be implied from acts or conduct reasonably tending to show an intention to adopt the act or contract"). A corporation may be found to have ratified an unauthorized act by adopting it or acquiescing in it, *Webb*, 177 Md. at 599, *Hill v. State*, 86 Md. App. 30, 36 (1991); by accepting and retaining its benefits, *Citizens Bank of Maryland v. Maryland Indus. Finishing Co., Inc*., 338 Md. 448, 463-64 n.9 (1995); or by failing to timely disavow or repudiate it, *Proctor v. Metro. Money Store Corp*., 579 F. Supp. 2d 724 (D. Md. 2008) (applying Maryland law). In all these circumstances, for ratification to happen there must be knowledge of the material facts affecting the act or transaction.

As we have noted, Oak Plaza is not a corporation; it is a limited liability company formed under the Maryland Limited Liability Act. Under that Act, each member of the company is an agent of the company for the purpose of its business, unless the articles of organization or operating agreement provide otherwise. CA § 4A-401. The Oak Plaza Operating Agreement in fact provides otherwise, at section 5.1.4.1, stating that no Member is an agent of the company and no Member has authority to act for the company solely

32

because he or she is a Member. So, because David's acts on behalf of Oak Plaza to defend Tower Oaks in the second foreclosure action were taken solely in his position as Member, they were not authorized.

As explained above, however, we are not dealing with an act taken by David that was outside the power of Tower Oaks and Oak Plaza to take. Tower Oaks had the power to defend itself in the second foreclosure action and Oak Plaza, through its Manager, was authorized to decide whether Tower Oaks would do so. Thus, David performed an act that the company had the power to perform, but that he did not have the authority to perform for the company. That type of unauthorized act can be cured, and ratification is one way of doing so. We see no reason why the doctrine of ratification cannot be applied to an act taken on behalf of a limited liability company by one without authority to act, just as the doctrine can apply to such an act of a corporation. The requirements of the doctrine must be satisfied, however.

Thomas and Daniel, as the Manager, jointly, of Oak Plaza, were authorized to take action to defend (or to decide not to defend) Tower Oaks in the second foreclosure action. In their brief, the substitute trustees acknowledge that Thomas's testimony was sufficient to show that he was ratifying David's unauthorized acts. With virtually no argument, Tower Oaks maintains that the evidence showed that Thomas **and** Daniel ratified David's unauthorized acts. The court did not make any factual findings on ratification, and the evidence adduced on January 10, 2013, was not legally sufficient to allow a finding that

33

Daniel was ratifying or had ratified David's unauthorized acts. Specifically, Daniel testified that he did not have any knowledge about the second foreclosure action, which meant that he did not have the knowledge of the material facts surrounding David's unauthorized acts to allow him to ratify them. Indeed, that was the very point Daniel made in his testimony. He did not know enough about the second foreclosure action to be able to say that he would authorize David to continue pursuing a defense for Tower Oaks in that action. Clearly, if Daniel did not have that knowledge, he also did not have the knowledge of material facts necessary to ratify David's acts from the outset of the defense of Tower Oaks in the second foreclosure action. As Thomas and Daniel are the Manager of Oak Plaza, jointly, any ratification would have to be made by both of them.[6] Accordingly, there was no evidence from which the court could have found, at the time of the January 10, 2013 hearing, that David's unauthorized acts, taken to defend Tower Oaks in the second foreclosure action, had been ratified by Thomas and Daniel.

---

[6]In the corporation setting, as a general rule, when the power to act is vested in two or more officers, that power cannot be exercised by one officer alone, unless the provision in the statute, charter, by-laws or other document creating the power is merely directory. Therefore, one cannot imply in either officer the authority to exercise the power alone. Fletcher, § 446. The same principle would apply to a limited liability corporation. Here, as the Manager, jointly, of Oak Plaza, Thomas and Daniel had the power to decide whether Tower Oaks would defend itself in the second foreclosure action; neither could make that decision alone. Therefore, for there to be a ratification of David's unauthorized acts taken in defense of Tower Oaks in the second foreclosure action, Thomas and Daniel both had to exercise the power to adopt and affirm the acts.

34

As mentioned previously, during the pendency of this appeal the second foreclosure action has proceeded. The Property was sold, Tower Oaks filed exceptions to the sale, the exceptions were dismissed, an order of ratification of sale was entered, and Tower Oaks filed a notice of appeal. Although, when the circuit court made the ruling that is the subject of this appeal, there was no evidence to support a finding that Thomas **and** Daniel ratified David's actions, ratification is not static. Facts may have developed as the litigation has continued that would support a finding that, sometime after the January 10, 2013 hearing, David's actions were ratified by Thomas and Daniel, in one or more of the multiple ways that ratification can take place. The only time period critical to this appeal is the January 10, 2013 hearing date, and facts sufficient to support a finding of ratification were not shown to have existed at that time.[7]

---

[7]In its opening brief, in what is at most a passing reference, Tower Oaks questions whether the substitute trustees had standing to challenge David's authority to defend Tower Oaks in the second foreclosure action. In the context of corporations, several courts have held that only a stockholder, officer, or director of the corporation can attack the authority of an officer of the corporation to initiate a lawsuit on behalf of the corporation. *See Advanced Optics Electronics, Inc. v. Robins*, 633 F. Supp. 2d 1237, 1252-53 (D. N. M. 2008) ("The general rule appears to be that third parties cannot challenge a corporation's authorization to sue. Notably, most courts have stated that third parties lack the right to challenge a corporation's authority to sue, but have not said that only the corporation itself can bring the challenge"(citations omitted)); *Farmers Union Oil Co. of New England v. Maixner*, 376 N.W.2d 43, 46 (N.D. 1985) (defendant in suit by corporation for breach of guarantee agreement could not challenge authority of chairman of board of directors to initiate the suit on behalf of the plaintiff corporation; "[a]s a general rule, if a corporation does not object to an officer's lack of authority, a third person may not object."). *See also Gemstar Ltd. v. Ernst & Young*, 917 P.2d 222, 231 n.3 (Ariz. 1996); *Hillcrest Paper Co. v. Ohlstein*, 10 Misc. 2d 286, 287 (N.Y. App. Div. 1958), *aff'd*, 6 A.D.2d 864 (N.Y. 1958); *Village of Brown Deer*
(continued...)

**ORDER AFFIRMED.  COSTS TO BE PAID BY THE APPELLANT**.

---

[7](...continued)

*v. City of Milwaukee*, 114 N.W.2d 493, 497 (1962).  However, some courts follow the somewhat broader rule that "[t]he authority of an officer or agent ordinarily can be questioned only by injured parties, such as the corporation and its stockholders *or creditors*." 19 C.J.S. *Corporations* § 699 (emphasis added).  In the case at bar, TOB Holdings is a creditor of Tower Oak.  In any event, this issue was not raised or decided below and is not adequately raised on appeal, so we shall not address it.