824 A.2d 87

**ALLSTATE INSURANCE COMPANY,**

**v.**

**John C. STINEBAUGH.**

**No. 81, Sept. Term, 2002.**

Court of Appeals of Maryland.

May 12, 2003.

632

634

Chris S. Mason (Webb, Burnett, Jackson, Cornbroooks, Wilber, Vorhis & Douse LLP, on brief), Salisbury, for appellant.

Andrew B. Greenspan, Annapolis, for appellee.

Argued before BELL, C.J., ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

BATTAGLIA, Judge.

In this appeal from the denial of a motion to compel arbitration, we must decide two issues. First, whether it is for courts, or for arbitrators, to determine if a particular dispute is for the courts or arbitrators to decide when parties enter into a general arbitration agreement, but subsequently bind themselves to a Consent Order that contemplates judicial resolution of a particular controversy. Second, what is the legal effect of an agreement that contemplates judicial resolution of a particular dispute, upon a prior, general arbitration agreement. As to the first issue, we conclude that courts, not arbitrators, should decide whether a prior agreement to arbitrate disputes applies when a subsequent agreement calls for a judicial resolution of the particular controversy. With respect to the second issue, we conclude, under the facts of this case, that the subsequent Consent Order called for a judicial resolution of the dispute at issue and, therefore, discharged the prior arbitration agreement with reference to the liability issue in controversy.

## I. Background

On May 19, 1996, Constance Lee was riding as a passenger in a vehicle operated by Charles Kirkpatrick, which was involved in an accident in Ocean City, Maryland. The Kirkpatrick vehicle was stopped at a traffic signal in a left turn lane on Coastal Highway. A second vehicle, stopped directly behind the Kirkpatrick vehicle, was operated by John Stinebaugh, who was insured by Nationwide Mutual Insurance Company. A third vehicle, operated by an unknown person (hereinafter "phantom vehicle"), was stopped to the right of the Kirkpatrick vehicle in a second left turn lane. When the traffic light turned green, Kirkpatrick attempted to complete the left turn but was cut off by the phantom vehicle. Kirkpatrick applied his brakes to avoid hitting the phantom vehicle, but when he did so, his vehicle was struck from behind by the vehicle operated by Stinebaugh.

On April 26, 1999, Lee filed a complaint in the Circuit Court for Worcester County against Kirkpatrick, Stinebaugh, and Allstate Insurance Company, Kirkpatrick's uninsured motorist carrier, seeking damages for injuries allegedly arising out of the automobile accident. Prior to trial, the parties reached an agreement which was memorialized in an April 10, 2001 Consent Order. That Order states that, "by agreement of all parties, Plaintiff's claim against all Defendants is hereby settled for the amount of Forty Thousand Dollars ($40,000.00), to be split evenly between Defendants Allstate Insurance Company and John Stinebaugh (Nationwide Mutual Insurance Company)...."[1] With respect to each insurer's rights against the other, however, the Consent Order states, "each insurer's contribution towards the settlement shall be subject to reimbursement and indemnification from the other insurer pending final determination of liability of the Defendants pursuant [to] *Fireman's Fund Insurance Co. v. Bragg*, 76 Md.App. 709, 548 A.2d 151 (1988)...." Specifically, the Order states that "the Cross-claims between Defendants shall remain at issue and subject to resolution on the currently scheduled trial date of May 17, 2001, or may be resolved by other means mutually agreed to by all Defendants."

Within three weeks after the Consent Order was filed, Allstate filed a Motion to Compel Arbitration, pursuant to Maryland Code, §§ 3–202, 3–206, and 3–207 of the Courts and Judicial Proceedings Article (1974, 1998 Repl.Vol.).[2] In that motion, Allstate stated that it was "the automobile liability carrier for Defendant Estate of Charles Kirkpatrick" and that

---

1. Nationwide was not included as a party defendant in the present litigation, but Allstate, Kirkpatrick's uninsured motorist carrier, was a party defendant. Kirkpatrick was removed from the lawsuit as he died sometime before trial.

2. Section 3–202 states:

 An agreement providing for arbitration under the law of the State confers jurisdiction on a court to enforce the agreement and enter judgment on an arbitration award.

 For the text of Sections 3–206 and 3–307, see the discussion later in this opinion, *infra*, Part II.

it was also "a party to the above-captioned case as a result of the uninsured motorist claims of Plaintiff, Constance Lee, which assert[s] that the automobile collision in the case at bar was caused by an unknown motorist" and that Nationwide and Allstate had "resolved claims filed by Plaintiff Constance Lee" by "each contributing 50% toward the settlement" of Lee's claim, but asserted that they still "dispute[d] liability as between themselves pursuant to *Fireman's Fund v. Bragg*, 76 Md.App. 709, 548 A.2d 151 (1988)." Allstate further asserted that, "[c]urrently and since the date of the occurrence [of] this lawsuit, Nationwide and Allstate have been signatory members of Arbitration Forums Inc., a special Arbitration forum for disputes arising between automobile liability insurers who transact business in the State of Maryland." According to Allstate, "[p]ursuant to the terms of the Arbitration Agreement signed by Nationwide and Allstate, Allstate and Nationwide agreed to submit all disputes arising between signatory members to arbitration," but Nationwide, according to Allstate, refused to arbitrate, despite Allstate's written demand to do so. Thus, Allstate requested the Circuit Court "to Order arbitration between Allstate and Nationwide in accordance with the terms of the Arbitration Agreement...." [3]

---

3. The portions of the arbitration agreement that Allstate deemed to be relevant were attached to its Motion to Compel Arbitration, and state in part:

WHEREAS, signatory companies have endorsed the principle of arbitration for the purpose of resolving certain disputes on claims in which two or more signatory companies are involved, and

WHEREAS, it is the desire of the said companies to encourage:

(a) the prompt settlement of all meritorious claims and suits;

(b) voluntary resolution of policy coverage disputes between several insurers of the same insured.

NOW, therefore, signatories to this Agreement hereby bind themselves as follows:

ARTICLE FIRST

To forego litigation and arbitrate unresolved disputes between two or more signatories wherein each has issued:

(a) a policy of casualty insurance covering one or more of a number of parties each asserted to be legally liable for an accident or occurrence out of which a claim or suit for bodily injury or property damage, or a first party payment arises, or as a self-insured has been alleged to be legally liable for an accident or occurrence; or

In opposition to the motion to compel arbitration, Stinebaugh argued, among other things, that the April 10, 2001 Consent Order required that the case remain in the Circuit Court unless all parties had mutually agreed otherwise, and that no such agreement had been made with respect to him. Initially, on May 7, 2001, Judge Groton of the Circuit Court granted Allstate's Motion to Compel Arbitration. Thereafter, however, Stinebaugh filed a motion for reconsideration, which Judge Groton granted on August 3, 2001, thereby rescinding his earlier order compelling arbitration, and ordering that the matter be set "for trial on the merits on the parties' cross-claims." In granting Stinebaugh's motion for reconsideration, Judge Groton opined that because Stinebaugh was "the party to the suit" and because Stinebaugh had not himself signed the insurer's arbitration agreement, Stinebaugh could not "be forced [in]to arbitration." [4]

Despite the Circuit Court's ruling, Allstate initiated arbitration with Arbitration Forums, Inc., a company that Allstate and Nationwide had agreed to use for the arbitration. Over Nationwide's objection, Arbitration Forums determined, notwithstanding Judge Groton's order to the contrary, that it had

---

(b) separate policies of casualty insurance to the same party or parties asserted to cover an accident or occurrence out of which a claim or suit for bodily injury or property damages or first party repayment arises.

With respect to the amount, if any, which each signatory shall ultimately pay toward a consummated settlement of any such claim or suit, provided such signatories have agreed on the overall settlement value of such claim or suit or first party repayment, it is recommended that each signatory pay an equal share of such settlement, but the settlement of a case in any ratio is made without prejudice to any party to the arbitration proceeding.

4. Allstate challenges the Circuit Court's reasoning, arguing that even though Stinebaugh was not a party to the insurance companies' arbitration agreement, the issue of negligence had to be submitted to arbitration because Stinebaugh's insurer, Nationwide, became a "real party in interest" in the lawsuit "by virtue of its settlement payment on behalf of Stinebaugh." We need not reach Allstate's "real party in interest" argument, however, because, as discussed below, we conclude that the legal effect of the April 10, 2001 Consent Order was that the liability issue was to be resolved in court, rather than in arbitration.

the authority to decide the merits of the case. Armed with that arbitrational determination, on March 13, 2002, Allstate filed a motion with the Circuit Court requesting that it reconsider its August 3, 2001 order granting Stinebaugh's motion for reconsideration and denying its motion to compel arbitration.

The Circuit Court denied Allstate's motion for reconsideration on March 18, 2002, the same day that the jury trial commenced. In denying Allstate's motion, Judge Groton explained:

> There was also a motion for reconsideration for arbitration, and in chambers we discussed that matter. My ruling was based on the order that was passed April the 10th of 2001, in which the last paragraph of that particular order indicated that the cross claims between the Defendant shall remain at issue and subject to resolution on the currently scheduled trial date of May 17th, although the issue was brought up, in fact, that the trial date wasn't conducted May 17th, the important wording in that particular part of the sentence is "trial date." That, in fact, the order, the way I read it, contemplated that the matter would be resolved by a trial, or may be resolved by other means mutually agreed by all Defendants. There has been no mutual agreement by the Defendant subsequent to this agreement. [Allstate's] position was that there was an agreement that was signed by both parties in general and prior to that date. My ruling is based on the fact that this order would take precedent over that because of the fact that it was signed subsequent to the agreement, and contained the phrase 'may be resolved by other means mutually agreed to by all Defendants,' meaning it would be subject to the agreement signed April the 10th.

The jury returned a special verdict on March 18, 2002, finding that the operator of the phantom vehicle was negligent and that Stinebaugh was not negligent. The Circuit Court entered judgment in the amount of $20,000 in favor of Stinebaugh and against Allstate. On July 14, 2002, Arbitration Forums reaffirmed its position that it had the power to decide

the merits of the dispute and determined that Stinebaugh had been negligent.

Allstate appealed to the Court of Special Appeals, arguing that the Circuit Court erred in rendering judgment against it because the parties had agreed to have the dispute resolved in arbitration. This Court, on its own initiative and prior to any proceedings in the Court of Special Appeals, issued a writ of certiorari, *Allstate v. Stinebaugh,* 371 Md. 613, 810 A.2d 961 (2002).

Before this Court, Allstate presents the following question: In light of the Consent Order of April 10, 2001, was jurisdiction to determine the liability between Co–Defendants Allstate Insurance Company and John Stinebaugh on their Cross–Claims vested in the Circuit Court for Worcester County, or with Arbitration Forums, Inc?

For the reasons discussed herein, we hold that the Circuit Court did not err in addressing the issue of the effect the Consent Order had upon the prior arbitration agreement. We further hold that the Circuit Court correctly concluded that, pursuant to the Consent Order, the liability issue was to be resolved in court rather than in arbitration. We shall, therefore, affirm.

## II. Discussion

Allstate contends that "the trial court erred by conducting an inquiry into whether the April 10, 2001 [Consent] Order took precedence over the arbitration agreement" because once the court acknowledged the existence of the insurance companies' arbitration agreement, the issue of arbitrability "was within the exclusive province of the arbitrator." In support of that contention, Allstate relies upon our decisions in *Holmes v. Coverall North America, Inc.,* 336 Md. 534, 649 A.2d 365 (1994), and *Gold Coast Mall, Inc. v. Larmar Corp.,* 298 Md. 96, 468 A.2d 91 (1983).

Stinebaugh, on the other hand, contends that the Circuit Court "properly applied principles of contract interpretation" to find that the prior arbitration agreement "had been super-

ceded by a later specific agreement between the parties to resolve the pending cross-claims" in court. In support of this contention, Stinebaugh asserts that the determination of whether an arbitration agreement exists is for the court, not the arbitrator, and further claims that the court correctly concluded that the Consent Order superseded the arbitration agreement because the Consent Order was more recent and specifically addressed the liability issue. For the reasons discussed below, we conclude that Allstate's reliance on *Holmes* and *Gold Coast Mall* is misplaced and that its contention is without merit.

■ In *Holmes, Gold Coast Mall,* and other decisions, we have recognized that the Maryland Uniform Arbitration Act expresses the legislative policy favoring enforcement of agreements to arbitrate. *Holmes,* 336 Md. at 546, 649 A.2d at 371 (recognizing "the legislative intent to favor arbitration"); *Gold Coast Mall,* 298 Md. at 103, 468 A.2d at 95(acknowledging that the Arbitration Act embodies a "legislative policy in favor of the enforcement of agreement to arbitrate); *see also Crown Oil & Wax Co. v. Glen Constr. Co.,* 320 Md. 546, 558, 578 A.2d 1184, 1189 (1990) (stating that "Maryland courts have consistently stated that the [Arbitration Act] embodies a legislative policy favoring the enforcement of executory agreements to arbitrate"); *Charles J. Frank, Inc. v. Associated Jewish Charities, Inc.,* 294 Md. 443, 448, 450 A.2d 1304, 1306 (1982)(recognizing that the Arbitration Act "embodies a legislative policy favoring enforcement of executory agreements to arbitrate"). The original Arbitration Act was enacted in 1965, and at the time of the proceedings below, was found in Maryland Code, §§ 3–201 through 3–234 of the Courts and Judicial Proceedings Article (1974, 1998 Repl.Vol.).

Section 3–206(a) of the Arbitration Act provides that:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy arising between the parties in the future is valid and enforceable, and is irrevocable,

except upon grounds that exist at law or in equity for the revocation of a contract.

Section 3-207 applies when a party denies the existence of an arbitration agreement, and states:

(a) *Refusal to arbitrate.*—If a party to an arbitration agreement described in § 3-202 refuses to arbitrate, the other party may file a petition with a court to order arbitration.

(b) *Denial of existence of arbitration agreement.*—If the opposing party denies existence of an arbitration agreement, the court shall proceed expeditiously to determine if the agreement exists.

(c) *Determination by court.*—If the court determines that the agreement exists, it shall order arbitration. Otherwise it shall deny the petition.

Section 3-210, which we have interpreted as prohibiting "the court from inquiring into the merits of a claim," *Crown Oil,* 320 Md. at 557, 578 A.2d at 1189, states:

An order for arbitration shall not be refused or an arbitration proceeding stayed:

(1) On the ground that the claim in issue lacks merit or bona fides; or

(2) Because a valid basis for the claim sought to be arbitrated has not been shown.

We have held, therefore, that the role of the court in deciding a motion to compel arbitration is limited to determining one question: "[I]s there an agreement to arbitrate the subject matter of a particular dispute?" *Gold Coast Mall,* 298 Md. at 103-04, 468 A.2d at 95 (stating that "The Act strictly confines the function of the court in suits to compel arbitration to the resolution of a single issue—is there an agreement to arbitrate the subject matter of a particular dispute"); *Holmes,* 336 Md. at 546, 649 A.2d at 370-71 ("The scope of the court's involvement extends only to a determination of the existence of an arbitration agreement"); *Crown Oil,* 320 Md. at 557, 578 A.2d at 1189 (recognizing that § 3-210 prohibits a court from inquiring into the merits of a claim, and that "under §§ 3-207 and 3-208 the sole question before the court is whether there exists an agreement to arbitrate").

In *Crown Oil*, this Court interpreted *Gold Coast Mall* as laying down "the rules for determining whether court or arbitrator determines arbitrability where the arbitrability issue is the scope of the arbitration clause and its applicability to the dispute at hand." 320 Md. at 559, 578 A.2d at 1190. First, in *Gold Coast Mall*, we declared that if an arbitration clause is clear, it is initially for the courts to determine whether the subject matter of a dispute falls within the scope of the arbitration clause. 298 Md. at 104, 468 A.2d at 95. Second, we explained that in determining whether a dispute falls within the scope of an arbitration clause, arbitration should be compelled if the arbitration clause is broad and does not "expressly and specifically exclude[]" the dispute. *Id.* Third, we concluded that if an arbitration clause is unclear "as to whether the subject matter of the dispute falls within the scope of the arbitration agreement," the question of arbitrability ordinarily should be left to the arbitrator. *Id.* 298 Md. at 107, 468 A.2d at 97.

The specific issue in *Gold Coast Mall* was whether a court or an arbitrator initially should determine whether a rental payment dispute arising from a lease agreement containing an arbitration clause was arbitrable. *Id.* at 99, 468 A.2d at 93. The lease agreement contained a clear, broad arbitration clause that required "both parties to arbitrate any and all disputes arising out of the agreement." *Id.* at 107, 468 A.2d at 97. "No type of controversy [was] expressly or specifically excluded from the requirement to arbitrate." *Id.* at 107–08, 468 A.2d at 97. Other provisions of the same agreement, however, provided the landlord with rights and remedies other than arbitration. *Id.* at 108, 468 A.2d at 97. We determined that, although the broad arbitration provision was clear when standing alone, it became unclear when juxtaposed against the other clauses within the same lease agreement that provided rights and remedies other than arbitration so that the arbitrator was the appropriate decision-maker. *Id.*

In *Gold Coast Mall*, there were conflicting clauses within the same contract—a broad arbitration clause required the

parties to arbitrate any disputes arising out of the contract, yet other clauses in the contract provided the landlord with rights and remedies other than arbitration. It was because of these internally inconsistent clauses that we concluded the scope of the arbitration clause was unclear, and therefore for the arbitrator to initially decide.

■ The present case is distinguishable because we are not faced with internally inconsistent clauses. To the contrary, here we have two wholly separate agreements: the former contains language that may or may not have required the liability dispute to be arbitrated; the latter contains language that clearly calls for a judicial resolution of the same dispute. Indeed, even if the arbitration agreement was broad, it is clear that the liability controversy was "expressly and specifically excluded" by the subsequent settlement agreement. The arbitration agreement here clearly was limited by the terms of the subsequent settlement agreement, unlike in *Gold Coast Mall*, where conflicting provisions within the same contract created ambiguity. Thus, the issue of arbitrability in the instant case was for the court to decide, and the Circuit Court did not err in doing so.

In *Holmes*, we addressed the issue of whether, in a dispute over a franchise agreement, courts, or arbitrators, should decide a breach of contract claim based on fraudulent inducement and violations of the Maryland Franchise Registration and Disclosure Act.[5] 336 Md. at 541, 649 A.2d at 368. We concluded that because the validity of the arbitration clause itself was not in dispute, the dispute was for the arbitrator. *Id.* at 547, 649 A.2d at 371. In so concluding, we explained that "an arbitration clause is severable from the entire contract," and that in "adjudicating a petition for an order of arbitration or a stay pending arbitration, the consideration of the existence of an arbitration agreement is severable." *Id.* at

---

5. At the time of our decision in *Holmes*, the Maryland Franchise Registration and Disclosure Act was located in Maryland Code, §§ 14–201 *et. seq.* of the Business Regulation Article (1992).

545–46, 649 A.2d at 370. We also observed that the role of the courts in deciding a motion to compel arbitration "extends only to a determination of the existence of an arbitration agreement." *Id.* at 546, 649 A.2d at 370–71. Finally, the petitioner's allegations of fraudulent inducement and violations of the Franchise Registration and Disclosure Act, we noted, "run to the merits of the dispute between the parties and do not suggest a [dispute] as to the actual existence of an arbitration agreement between the parties." *Id.* at 546, 649 A.2d at 371.

The resolution of the issue in the present case, unlike in *Holmes,* does not require that a court delve into the merits of the dispute, i.e. which insurer was liable. The debate in the present case is over the applicability of the prior arbitration agreement in light of the subsequent settlement agreement embodied in the court-approved Consent Order. As such, it is a dispute as to the existence of an agreement to arbitrate the issue of negligence, and was therefore, as discussed in *Holmes,* within the "scope of the court's" authority in determining a motion to compel arbitration. *Id.* at 546, 649 A.2d at 370. Other cases decided by this Court also support this conclusion.

In *Stephen L. Messersmith, Inc. v. Barclay Townhouse Assocs.,* 313 Md. 652, 547 A.2d 1048 (1988), for instance, we concluded that a court should employ a *de novo* standard of review when an "arbitration award is attacked for lack of jurisdiction" on the ground that no agreement to arbitrate existed. *Id.* at 664, 547 A.2d at 1053–54. In so concluding, we stressed that, "it is beyond dispute that, absent an arbitration agreement between the parties, an arbitration panel cannot validly assert jurisdiction to decide a dispute between them." *Id.* at 658, 547A.2d at 1051. Consequently, "because the existence of an agreement to arbitrate is a threshold issue, the courts must have authority to assess, independently of the arbitrator's point of view, whether or not the parties ever reached such an agreement." *Id.* at 660, 547 A.2d at 1052. Similarly, in the present case, the issue of the effect of the subsequent Consent Order upon the prior arbitration agree-

ment goes to the existence of an agreement to arbitrate the liability dispute and was for the court to decide.

Also, in *Chesapeake Beach v. Pessoa Constr. Co.*, 330 Md. 744, 625 A.2d 1014 (1993), we observed that, "we have consistently held that timeliness of the demand for arbitration is for the courts and not the arbitrators." *Id.* at 747–48, 625 A.2d at 1016 (citations omitted). We explained that timeliness of a demand for arbitration is for the courts to decide "because the existence of an agreement to arbitrate is conditioned on the making of a timely demand; in the absence of a timely demand, there is no agreement to arbitrate." *Id.* at 748, 625 A.2d at 1016. This is so, we noted, because "an inappropriate delay in demanding arbitration acts as a relinquishment of the contractual right to compel such a proceeding . . . ." *Id.* at 748–49, 625 A.2d at 1016 (quoting *Stauffer Constr. v. Bd. of Educ.*, 54 Md.App. 658, 668, 460 A.2d 609 (1983)). Similarly, the effect of a subsequent agreement addressing judicial resolution of a particular dispute and not specifically mentioning arbitration, upon an earlier general arbitration agreement that may have required that the dispute be arbitrated, goes to the existence of an agreement to arbitrate the specific dispute and is, therefore, proper for the court to decide.

Having determined that the Circuit Court properly considered the effect of the Consent Order upon the prior arbitration agreement, we now turn to evaluate whether the Circuit Court erred in concluding that the issue of liability was to be resolved in court, because the Consent Order superseded the arbitration agreement.

Although no Maryland appellate decisions have addressed this issue, at least one other state supreme court has opined. In *Shawnee Hosp. Auth. v. Dow Constr.*, 812 P.2d 1351 (Okla.1990), the Supreme Court of Oklahoma was called upon to decide whether a contract's arbitration clause was enforceable to resolve claims unresolved by a subsequent settlement agreement. *Id.* at 1352. In that case, Dow Construction entered into a contract with Shawnee Hospital Authority that contained an arbitration clause. A dispute arose prompting the Hospital to bring a breach of contract claim against Dow.

In the midst of trial, the parties entered into a court-approved settlement agreement. That agreement terminated Dow's obligations under the construction contract "with respect to any further performance obligations" but reserved Dow's obligations regarding "hidden or latent defects in the contract work heretofore completed. . . ." *Id.* at 1354 n. 16. The settlement agreement also stated, "The court shall retain jurisdiction to reopen the case, if necessary, to conclude this litigation by non-jury trial or to enforce the terms" of the settlement agreement. *Id.* Five months after settlement, the Hospital filed a claim seeking damages for latent defects in the construction work. *Id.* at 1352. In response, Dow filed a motion to compel arbitration, which the trial court denied. *Id.*

In affirming the trial court's denial of Dow's motion to compel arbitration, the Oklahoma Supreme Court looked to the following principles of contract law:

Before full performance, contractual obligations may be discharged by a subsequent agreement whose effect is to alter, modify, or supersede the terms of the original agreement or to rescind it altogether. A claim under an earlier contract will be governed by a later agreement if the latter operates to supersede or rescind the former. Where not expressly stated, the legal effect of the later contract on the former must be gathered from a four-corners' examination of the contractual instrument in question.

*Id.* at 1353–54 (footnotes omitted). Employing these principles, the Court concluded that the Hospital's latent defect claim was not subject to arbitration. *Id.* at 1355. The Court explained that, although the settlement agreement "extinguished Dow's obligation to continue its performance under the construction contract," it did not discharge Dow from its obligation to remedy latent defects. *Id.* at 1354. Moreover, the settlement agreement contained no arbitration provision with respect to such claims. Thus, the Court held that the settlement agreement superseded the construction contract, and that the earlier construction contract's arbitration clause, therefore, was not enforceable to resolve the latent-defect claims. *Id.* at 1355.

We have embraced legal tenets similar to those employed by our sister state regarding arbitration and contract law. Arbitration is "consensual; a creature of contract." *Curtis G. Testerman Co.*, 340 Md. at 579, 667 A.2d at 654 (quoting Thomas J. Stipanowich, *Arbitration and the Multiparty Dispute: The Sarch for Workable Solutions*, 72 IOWA L.REV. 473, 476 (1987) (citation omitted)). As such, "[a] party cannot be required to submit any dispute to arbitration that it has not agreed to submit," *id.* (quoting *Gold Coast Mall*, 298 Md. at 103, 468 A.2d at 95), and "[t]he intention of the parties controls on whether there is an agreement to arbitrate." *Crown Oil*, 320 Md. at 558, 578 A.2d at 1189. Further, like Oklahoma, we have recognized that rights and obligations under contracts may be discharged by subsequent agreements. *See, e.g., Calabi v. Government Employees Ins. Co.*, 353 Md. 649, 653, 728 A.2d 206, 208 (1999)(stating that a settlement agreement is "an agreement to discharge a preexisting claim"); *Linz v. Schuck*, 106 Md. 220, 234, 67 A. 286, 290 (1907) (stating that modification is "an abandonment of the original contract and the creation of a new contract"). A consent order in Maryland, like an arbitration agreement, is a matter of contract. *Long v. State*, 371 Md. 72, 82, 807 A.2d 1, 7 (2002)(stating that a consent order is a hybrid, "having attributes of both contracts and judicial decrees"). The contractual aspect of a consent order is the settlement agreement that the consent order memorializes.[6] *Calabi*, 353 Md. at 653, 728 A.2d at 208. A settlement agreement is "an agreement to discharge a preexisting claim." *Id.* Unless there is "clear evidence to the contrary," a settlement agreement in Maryland is "regarded as an executory accord."[7] *Clark v. Elza*,

---

6. Nationwide, although not named as a party defendant in the litigation at issue, has admitted that it was nonetheless bound by the Consent Order entered into by Stinebaugh, Nationwide's insured. We further note that pursuant to the terms of the Consent Order, Nationwide did pay Lee $20,000 to settle her claims.

7. Executory accords are closely related to substituted contracts. With a substituted contract, however, the parties intend "the new agreement

286 Md. 208, 215, 406 A.2d 922, 926 (1979). In *Clark,* we adopted the following definition of an executory accord:

> The term 'accord executory' is and always has been used to mean an agreement for the future discharge of an existing claim by a substituted performance. In order for an agreement to fall within this definition, it is the promised performance that is to discharge the existing claim, and not the promise to render such performance.

*Id.* at 214, 406 A.2d at 925 (quoting 6 Arthur Linton Corbin, *Corbin on Contracts* § 1268 at 71 (1962)).

 In the present case, there is no dispute that the terms of the April 10, 2001 Consent Order were fully executed. Thus, the effect of a consent order in Maryland, like in Oklahoma, is that it may discharge an existing claim by a substituted performance.

 The plain, unambiguous language of the April 10, 2001 Consent Order which memorialized the settlement agreement states that, "each insurer's contribution towards the settlement shall be subject to reimbursement and indemnification from the other insurer pending final determination of liability of the Defendants...." The Consent Order clearly indicates where the liability determination was to occur—"The Cross-claims between Defendants shall remain at issue and subject to resolution on the currently scheduled trial date of May 17, 2001, or may be resolved by other means mutually agreed to by all Defendants." The latter language is prospective in character.[8] Thus, the Consent Order clearly superseded the

---

itself to constitute a substitute for the prior claim" thus, "immediately discharg[ing] the original claim." *Clark v. Elza,* 286 Md. 208, 214, 406 A.2d 922, 926 (1979). Consequently, with a substituted contract, "since the original claim is fully extinguished at the time the agreement is made, recovery may only be had upon the substituted contract." *Id.*

8. The language of the Consent Order in the present case made no reference to the insurers' prior arbitration agreement. Therefore, because we have recognized that, "where a writing refers to another document, that other document is to be interpreted as part of the writing," *Wheaton Triangle Lanes, Inc. v. Rinaldi,* 236 Md. 525, 531, 204 A.2d 537, 540 (1964), the arbitration agreement in the instant case

arbitration agreement and discharged any right Allstate may have had to arbitrate the negligence controversy.

 We would note further that the Consent Order could be viewed as modifying the prior arbitration agreement. Allstate and Nationwide entered into an executory arbitration agreement in which they agreed to arbitrate "certain disputes on claims in which two or more signatory companies are involved." They were subsequently bound by a Consent Order in which claims were settled by each of the insurance companies paying one half of a settlement amount. That Consent Order did not contain any provision regarding arbitration of the liability issue. To the contrary, as previously discussed, the Consent Order clearly indicated that the negligence claim was to be resolved in court. "It is ... well settled that an earlier agreement may be modified by a later one, by mutual consent." *Thomas v. Hudson Motor Car Co.*, 226 Md. 456, 460, 174 A.2d 181, 183 (1961); *see also* II E. Allen Farnsworth, *Farnsworth on Contracts* § 7.2 at 214 & n. 15 (2nd ed.1998)(recognizing that, "[a]ny contract ... can be discharged or modified by subsequent agreement of the parties")(quoting Arthur L. Corbin, *The Parole Evidence Rule*, 53 YALE L.J. 603, 607 (1944)(also noting that "Restatement Second § 213 expresses this thought by stating that the latter written agreement 'discharges prior agreements'"); *Linz v. Schuck*, 106 Md. at 234, 67 A. at 286 (stating that modification is "an abandonment of the original contract and the creation of a new contract").

Thus, we conclude that the Circuit Court was correct in refusing to compel arbitration.

***JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.***

---

was not incorporated into the Consent Order. *See Powell v. Board of Sch. Dirs.*, 133 Vt. 609, 349 A.2d 879, 881 (1975)(stating that if an extrinsic writing is not "connected by specific reference" and was "foreign to the minds of the parties at the time of their undertaking, it is clearly irrelevant as an aid to interpretation")(quoting, *Newton v. Smith Motors, Inc.*, 122 Vt. 409, 175 A.2d 514, 516 (1961)).