*Marcia Rankin, et al. v. Brinton Woods of Frankford, LLC*, *et al.*, No. 525, September Term, 2017.  Argued:  April 9, 2018.  Opinion by Sharer, J.

**ARBITRATION AGREEMENTS – NURSING HOME ADMISSION CONTRACTS – HEALTH CARE DECISIONS – THIRD PARTY SIGNERS**

Arbitration agreements that require the contracting parties to waive their right to a jury trial must be conspicuous and the provisions must be clear, concise, and comprehensive for the contracting parties.

Enforceability of arbitration agreements contained within nursing home admission contracts executed by someone other than the patient, will depend on whether the person who executed the contract on behalf of the patient was the patient's authorized agent with the authority to enter into an arbitration agreement which includes the waiver of the patient's rights to a jury trial.  Absent actual or apparent agency with the authority to execute such an agreement, there can be no valid or enforceable arbitration agreement.

**ARBITRATION AGREEMENTS – AGENCY – SCOPE OF AUTHORITY**

Agency relationships are created either explicitly from the principal's express representations, whether oral or written, or implicitly through the principal's acquiescence in or ratification of the agent's actions taken on the principal's behalf.  Whether actual or apparent, an agent may not exceed the scope of authority created by the principal-agent relationship.

When determining if a principal-agent relationship existed between the party executing a nursing home admission contract and the patient to be admitted, in the absence of a written agency directive, the court must look to what representations the signing party made to the nursing home and whether it was objectively reasonable for the nursing home to have relied on those representations, without the need for the principal to later ratify the execution of the admission contract and consent to be bound by the arbitration agreement.

We hold that, because the record does not support the trial court's finding of apparent agency, the Estate is not bound by the arbitration provisions of the admission agreement.

**ARBITRATION AGREEMENTS – UNCONSCIONABILITY – REVIEW – FACT FINDING**

Alternatively, we hold that the provisions of the admissions contract, and particularly the arbitration/jury trial waiver clauses, are overbearing, as between a sophisticated party and an unsophisticated party, in what is clearly a contract of adhesion.  Thus, we conclude that the terms of the agreement are unenforceable as unconscionable.

Circuit Court for Baltimore City
Case No. 24-C-16-005938

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 525

September Term, 2017

_____

MARCIA RANKIN, ET AL.

v.

BRINTON WOODS OF FRANKFORD, LLC,
ET AL.

_____

Meredith,
Leahy,
Sharer, J. Frederick
      (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Sharer, J.

_____

Filed:  June 27, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Willie Charles, Jr. died during his brief stay as a patient at Brinton Woods of Frankford, LLC. Thereafter, appellants, Marcia Rankin, individually and as personal representative of her father's estate, Mark Allen, and Dawn Tracey brought, in the Circuit Court for Baltimore City, a negligence action for survival and wrongful death claims against several Brinton Woods entities.[1]

Brinton Woods responded to the complaint by filing a motion to compel arbitration pursuant to provisions of the admission contract, which had been executed by Rankin on behalf of Mr. Charles. The circuit court ruled that Rankin had acted as her father's agent – on an apparent agency theory – when she executed the admission contract on his behalf and, therefore, the estate was bound by the arbitration agreement provisions.

The court granted Brinton Woods' motion as to the survival claims, but denied the motion as to the wrongful death claims. The Court ordered a stay of the wrongful death proceedings pending arbitration of the survival claims.

The Estate asserts that the circuit court erred in granting Brinton Woods' petition to compel arbitration, based on its finding of apparent agency.[2] Alternatively, it asks this Court to hold the arbitration clause unenforceable as unconscionable.

---

[1] Rankin, Allen, and Tracey are the surviving children of Mr. Charles. We shall refer to appellants, collectively, as Rankin or the Estate.

Appellees are Brinton Woods of Frankford, LLC, Brinton Woods Post-Acute Care Center, Brinton Woods Health Care Center, LLC, and Brinton Woods Management Company, LLC. We shall refer to the Brinton Woods entities, collectively, as Brinton Woods.

[2] In its opening brief, the Estate poses three questions for our consideration:

Because we shall hold that the circuit court erred in finding Rankin to have been Mr. Charles' agent, and therefore erred in ordering arbitration based on that finding, we shall reverse and remand the matter for further proceedings. Moreover, we find the arbitration provisions of the contract to be unconscionable and, therefore, unenforceable.

## I. BACKGROUND

Mr. Charles entered Brinton Woods Post-Acute Care Center on June 19, 2015. The day prior to his admission, Rankin executed an admission contract on his behalf. The contract included a clause that required all disputes that "arise[] regarding the care or treatment of the Resident while residing at this Facility," be submitted to a mediator for resolution. The resolution clause further provided that, if mediation efforts failed to resolve the disputes, "any controversy that remains unsettled after mediation[,]" must be submitted to an arbitration process.[3]

The Estate's Complaint alleged that, while in the care of Brinton Woods, Mr. Charles developed serious health concerns including "painful pressure ulcers [bed sores]

1. Did the Circuit Court err in finding Ms. Marcia Rankin was the apparent agent of her father, Mr. Willie Charles?

2. Did the Circuit Court err in finding Ms. Marcia Rankin had apparent authority to make a health care decision for her father, Mr. Willie Charles, and waive his right to a jury trial when she signed an admission contract containing an arbitration agreement despite Mr. Charles being competent to make his own health care decisions and no valid Advance Directive or Power of Attorney being in effect?

3. Did the Circuit Court err in ruling the arbitration agreement contained within an admission contract to a skilled nursing facility was not unconscionable?

[3] The mediation requirement is not an issue in this appeal.

2

and penile necrosis [gangrene]," as a result of being deprived of adequate toileting, skin, and catheter care. These adverse conditions were alleged to have been caused by Brinton Woods' negligence and, thus, responsible for having caused and expedited his death.

## Proceedings

The Estate's Complaint was filed on November 14, 2016. Prior to answering the complaint, Brinton Woods filed a Petition to Compel Mediation and/or Arbitration and Motion to Dismiss or Stay Proceedings. Brinton Woods asserted that Rankin executed the admission contract as the health care agent for Mr. Charles, thus binding the Estate to the arbitration clause.

In the Estate's response, it argued that Rankin was not Mr. Charles' agent, and had neither actual nor apparent authority under his advance directive, or otherwise, to enter into an arbitration agreement on his behalf. Alternatively, it argued that the arbitration agreement was unconscionable and should not be enforced.

Following a hearing, the circuit court issued a memorandum opinion and order granting Brinton Woods' petition as to the survival claim only and stayed the wrongful death claim. The motion to dismiss was denied.

## Standard of Review

When our review of a circuit court's decision involves both questions of fact and of law,

> we apply different standards of review to the questions of fact and to the questions of law. One of our considerations is whether [the signing party] was [the patient's] agent for purposes of binding him to the arbitration agreement. This is a factual determination that we review using the clearly erroneous standard. Under the clearly erroneous standard, we will not

3

disturb the factual findings of the trial court [i]f there is any competent evidence to support th[ose] factual findings. As to questions of law, both parties have presented legal arguments based on their interpretation of statutory and case law. We consider those arguments *de novo*; in other words, we review the questions as a matter of law….

*Dickerson v. Longoria*, 414 Md. 419, 432–33 (2010) (internal quotations and citations omitted).

This case was heard below on Rankins's Motion to Dismiss Brinton Woods' Petition to Compel Arbitration. Because enforceability of the arbitration agreement depends on whether Rankin was her father's agent and authorized to enter into such an agreement on his behalf, we review the circuit court's finding of apparent agency.

## II. DISCUSSION

### 1. The Court's Agency Finding

We have explained that, "[w]hen a party asserts a claim that is dependent upon an agency relationship created by inference, that party has the burden of proving the existence of the principal-agent relationship, including its nature and its extent." *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 565 (2008) (citing *Hofherr v. Dart Industries, Inc.*, 853 F.2d 259, 262 (4th Cir. 1988)). Agency is a question of fact and such a finding will not be disturbed unless it was clearly erroneous. *See Dickerson*, 414 Md. at 433.

The circuit court concluded that "Rankin had apparent authority to enter into the agreement with [Brinton Woods][,]" finding that, "[a]t the time the contract was signed, [Brinton Woods] had not yet evaluated the decedent's capacity and had no knowledge as to whether or not he was capable of entering into the contract himself." The court also found that the "Advance Directive was provided to the Defendant Brinton Woods at the

4

time of admission to its facility."  Additionally, the court found that Rankin "identified herself as both 'agent' and 'daughter' of her father[,]" and placed significance on the fact that "*he moved into the facility*."  (Emphasis in original).  Based on those findings, the court concluded that "[Mr. Charles] was fully aware and complicit in allowing [Rankin] to act as his apparent agent, and that [Brinton Woods] reasonably relied on that apparent agency."

At that juncture, the record before the circuit court consisted of, in addition to the pleadings:  the initial complaint, with the attached Letters of Administration of a Small Estate and the Certificate of Merit and Report; the petition to compel arbitration, with the attached copy of the admission contract and the Daren Cortese[4] affidavit; the response opposing the petition, with a copy of the advance directive and Rankin's affidavit; and Brinton Woods' reply to the response opposing the petition.

Brinton Woods' petition to compel arbitration, and supporting memorandum, asserted that Rankin "is identified in the Admission Contract as her father's agent[,]" and that "she had provided documentation to Brinton Woods identifying her as the health care agent of Mr. Charles."  Those assertions were supported by repeated references to the Cortese affidavit and excerpts from the admission contract.  The advance directive executed by Mr. Charles, referred to in the Cortese affidavit, however, was not appended to the petition.[5]

---

[4] The affidavit, executed on January 5, 2017, identifies Daren Cortese as "President and Owner of Defendant Brinton Woods Health Care Center, LLC …."

[5] Brinton Woods addresses its failure to attach a copy of the advance directive with the petition in a footnote to its reply, contending that the "argument rested on the existence of an advance directive, not the specific contents therein and thus, [it had] erred on the side

The Cortese affidavit, relied on by Brinton Woods, does not in fact support those assertions or the court's finding that the advance directive had been provided to Brinton Woods at the time the admission contract was executed. The affidavit, executed by Cortese as "President and Owner of Defendant Brinton Woods Health Care Center, LLC[,]" provides that the affiant is "familiar with the operations" and that he reviewed "materials *relating* to the admission" of Mr. Charles. (Emphasis added). Further, based on his review of those materials, he "can attest that the Admission Contract is a true and accurate copy of the Admission Contract from the Brinton Woods business records governing the admission [sic] Willie Charles, Jr." While the affidavit might have supported the accuracy of the copy of the admission contract provided from the business records, it does not support the circumstances surrounding the contract's execution or the receipt of the advance directive.

The Cortese affidavit also affirms an inaccurate representation, purporting that the advance directive "authorized Ms. Rankin to make health care decisions on [Mr. Charles'] behalf[,]" which was contradicted by both Rankin's affidavit and the language of the advance directive itself, as it failed to include that such authority was conditioned on Mr. Charles being certified as incapable of making informed decisions regarding his own health care. The language of the advance directive clearly established the condition precedent for its efficacy, by stating "[m]y agent's authority becomes operative when my attending

_____

of adding fewer sheets of paper to the [c]ourt's file by simply acknowledging the advance directive in the sworn affidavit[,]" – a facially hollow argument, since the advance directive consisted of just three pages.

physician and a second physician determine and certify in writing that I am incapable of making an informed decision regarding my health care …." To this point, the circuit court correctly concluded that "Rankin did not have actual authority since the decedent's Advance Directive only conveyed actual authority to [Rankin] at such time that decedent was incapacitated." Notwithstanding that finding, the court appears to have relied on the advance directive and, possibly, the Cortese affidavit's reference, as evidence of Rankin's apparent agency.

In support of its finding of Rankin's apparent agency, the court posed the rhetorical question: "Why else would [Rankin] have shown the Advance Directive to [Brinton Woods] if not to satisfy [it] that she had the ability/authority to sign the admissions contract?"

The circuit court challenged the Estate's arguments during the petition hearing, stating that:

> It is disingenuous to argue, as Plaintiff's [sic] counsel did at the hearing, that the decedent was not aware that an admission contract of some kind was signed before he was admitted to Defendant Brinton Woods. To insist on one hand that he was totally competent as to invalidate the Advance Directive but not competent enough to know a nursing home would require signed paperwork before he moved into the facility seems inconsistent….

This finding, however, does not take into account the scope of the agency. As the *Dickerson* Court noted, "an agent cannot extend his or her own authority beyond the authority granted to him or her by the principal." 414 Md. at 449 (citation omitted). Further, the court's assumption that arbitration clauses are common in nursing home admission contracts, is a fact which the *Dickerson* Court acknowledged is not always the

7

case.[6]  There is an absence of evidence of past assent to the execution of an admission contract that contained an arbitration clause, or that such clauses are common in nursing home admission contracts, so that an applicant should reasonably expect an admission contract to contain such a clause.

Brinton Woods does not suggest that Rankin represented that Mr. Charles had been certified incompetent and that she had the authority bestowed in the advance directive, as his health care agent.[7]  As explained in the admission contract, advance directives are to assist in the making of "future medical treatment" decisions if the patient becomes incapable of doing so.[8]

---

[6] The *Dickerson* record contained admission contracts from several other health care facilities to which Bradley had been admitted, but the Court pointed out that "[n]one of these admissions documents included arbitration agreements, so they do not suggest that Bradley had previously authorized Dickerson to sign arbitration agreements on his behalf, either expressly or impliedly."  414 Md. at 449 n.18.

[7] Brinton Woods concedes that "[Rankin] signed all of the documentation as 'agent' and as 'daughter' of her father before Brinton Woods was able to form any opinion about whether Mr. Charles could sign these documents on his own behalf."  However, the name "Willie Charles, Jr." is not found anywhere in the admission contract.  Other than the words "agent" and "daughter" in the contract and in the section designating Rankin as the person to be contacted in the event of the death of the patient, respectively, there is no other written identity of the prospective patient.

[8] The Certificate of Merit and Report, attached to the complaint, states that Mr. Charles was transferred to Brinton Woods from Good Samaritan Hospital on June 19, 2015.  The advance directive statute requires an attending physician, who is made aware of an advance directive, "shall promptly: … make the advance directive or a copy of the advance directive a part of the declarant's medical records[.]" Md. Code (2000, 2009 Repl. Vol., 2014 Supp.) Health-General Article, § 5-602(f)(2)(i).  Those facts might reasonably give rise to an inference that Brinton Woods came into possession of the advance directive by virtue of it being included with Mr. Charles' medical records, which would have accompanied him on his transport from the hospital to Brinton Woods.

The complaint alleges that Mr. Charles was placed in Brinton Woods because his medical conditions "needed close medical and nursing supervision" that "required professional attention," so that he could "receive that specialized care." The complaint also alleges, and Brinton Woods does not contest, that prior to his admission, Brinton Woods "had full knowledge of Mr. Charles' medical condition[.]" As such, in the case of Mr. Charles, an advance directive would have been necessary if, or when, he was to become incapable of making a health care decision, and certified as such, while in the care of Brinton Woods.

In *Dickerson*, the Court of Appeals qualified the applicability of the Health Care Decisions Act (HCDA),[9] stating that "the HCDA pertains only to 'health care decisions,'" and "establishes procedures by which an individual may make health care decisions to be carried out if he or she is unable to make those decisions for him or herself." 414 Md. at 435. The "intent is demonstrated by the HCDA's mandate that treatment may only be provided, withheld, or withdrawn pursuant to the HCDA *if the patient is incapable of making an informed decision regarding the treatment*." *Id.* (emphasis added) (internal quotations and citations omitted). Notwithstanding, the *Dickerson* Court also noted that "[n]othing in the HCDA … restricts the ability of an individual to appoint a health care agent when, as in the present case, the individual who is to receive health care is apparently capable of making informed decisions on his or her own behalf." *Id*. (footnote omitted).

---

[9] Codified under Md. Code (2000, 2009 Repl. Vol., 2014 Supp.) Health-General Article, §§ 5-601 through 5-626.

9

The circuit court found that Rankin, by crossing out the word "Resident" and writing the word "agent" below it on the contract, coupled with Mr. Charles' move into the facility, was "conduct by the principal which caused [Brinton Woods] to believe [Rankin] was authorized[.]" However, that action alone should not support the court's finding of what Brinton Woods "reasonably relied" on as evidence of an apparent agency, particularly in view of the existence of the advance directive.

Brinton Woods asserts that the advance directive acted "as additional evidence to support [its] reasonable reliance on the apparent authority Mr. Charles invested in Ms. Rankin." It contends that "[t]he clearest indication that Mr. Charles authorized his daughter to reach a decision about a nursing facility in which he would reside was Mr. Charles moving into Brinton Woods the day after Ms. Rankin executed the Admission Contract." Brinton Woods also found support in the admission contract, where Rankin "acknowledged herself to be both 'agent' and 'daughter' of Mr. Charles[,]" and "had supplied [Brinton Woods] with a copy of the Advance Directive executed by her father in 2008." Brinton Woods attaches significance to the fact that "none of the terms of the Admission Contract became applicable unless Mr. Charles actually became a resident of the facility." The Estate disagrees and contends that, under *Dickerson*, agency law is inapplicable when the receipt of health care is conditioned on signing an arbitration clause and waiving the right to a jury trial.

Rankin's apparent crossing out of the word "Resident" and writing the word "agent" below it on the contract does not alone support a finding that she held herself out as her father's agent. However, whether this act alone could be sufficient to support a nursing

10

home's reasonable reliance on that act as evidence of her authority to execute an admission contract, is another issue. As the *Dickerson* Court addresses, "[r]egardless of how she held herself out to others, [she] could not expand her own authority and bind [the applicant] to the arbitration agreement." 414 Md. at 449–50.

Other than Rankin's act of writing the word "agent" on the contract, there is little evidence that Mr. Charles had granted her the authority to make a health care decision on his behalf at the time she executed the admission contract, let alone one that also impacted his right to a trial.

Before the motions court, Brinton Woods argued that Rankin "didn't say I don't have the authority to sign this [agreement][,]" and explained that "[w]hat they were presented with was an advance directive, … and they were dealing with the person that's designated as the responsible party or acted as a responsible party." Brinton Woods argued further, claiming that "[a]dvanced directives are of no import[,]" and that it is, "at best, an indicia to the nursing home that the person before them has authority to sign the contract because that person has been designated by the resident to act if the resident becomes incapacitated." Brinton Woods continued that "the best evidence of actual authority is how did the parties comport themselves after the contract was signed[;] [t]hey moved the resident in [sic] the facility."

Even were we to accept the court's apparent agency finding, the question remains: Did that apparent authority extend to the execution of an admission contract that contained a binding arbitration clause?

**Existence of a Binding Arbitration Agreement**

11

When interpreting an arbitration clause in a contract, we follow the objective law of contract interpretation. *Freedman*, 190 Md. App. at 192. As such, we

> "must first determine from the language of the agreement itself what a reasonable person in the position of the parties would have meant at the time it was effectuated.… In these circumstances, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant…."

*Id*. (quoting *Koons Ford of Balt., Inc. v. Lobach*, 398 Md. 38, 47 (2007)).

The circuit court relied heavily on *Dickerson, supra*, to support its finding that "[t]he decedent's access to and receipt of health care was subject to the completion of the full admission agreement, including the agreement to arbitrate." The court also found that Rankin, "acting as decedent's agent, made a health care decision on behalf of the decedent to admit him into [Brinton Woods], which included accepting on behalf of the decedent the obligation to participate in arbitration."

Brinton Woods agrees with the court's conclusions, averring that "the Circuit Court properly concluded that execution of the Admission Contract constituted a health care decision." It claimed that Rankin's "decision to execute the Brinton Woods agreement as written therefore constituted her decision to admit her father to that facility, a health care decision."

The Estate contends that the court "committed reversible error by holding in the absence of a valid and in-effect Advanced Directive or Power of Attorney, [Rankin] was the apparent agent of her father authorized to make a health care decision on his behalf – the signing of the admission contract -- [sic] and bind her father to an arbitration agreement,

12

thereby waiving his jury trial rights." For support, the Estate focuses on the language in *Dickerson*, where the Court of Appeals concluded that,

> neither a power of attorney nor any other advance directive is required to bind a nursing-home resident to an arbitration agreement included in nursing-home admission documents *when, as in this case, signing the arbitration agreement is not a prerequisite to admission to the nursing home*.

414 Md. at 431–32 (emphasis added).

The Estate interprets this language to mean that "if signing the arbitration agreement was a prerequisite to admission, then a valid power of attorney or advanced directive would be required because it would involve a health care decision." With that in mind, the Estate asserts that "[a]pparent agency law is inapplicable to arbitration agreements when receipt of health care is conditioned on signing an arbitration agreement and waiving jury trial rights." Further, it contends that, absent a document granting such authority, "the actual recipient, if competent, of the prospective health care must sign the arbitration agreement/paperwork[.]"

The Maryland Uniform Arbitration Act "'expresses the legislative policy favoring enforcement of agreements to arbitrate[.]'" *Fraternal Order of Police, Montgomery Cty. Lodge 35 v. Montgomery Cty.*, 216 Md. App. 634, 641 (2014) (quoting *Stinebaugh*, 374 Md. at 641). "'Arbitration is a process whereby *parties voluntarily agree* to substitute a private tribunal for the public tribunal otherwise available to them.'" *Schneider Elec. Bldgs. Critical Sys., Inc. v. Western Sur. Co.*, 454 Md. 698, 706 (2017) (emphasis in original) (quoting *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship* (*Scarlett Harbor*), 346 Md. 122, 127 (1997)). Because "'[a]rbitration is consensual[,] …

13

only those who consent are bound[.]'" *The Redemptorists v. Coulthard Servs., Inc.*, 145 Md. App. 116, 134 (2002) (quoting *Scarlett Harbor*, 346 Md. at 127).

While there was a clear manifestation by Mr. Charles to grant Rankin the authority to make health care decisions on his behalf pursuant to the conditions of the advance directive, the record is equally clear that the advance directive was not operative at the time of the execution of the admission contract because Mr. Charles had not been certified as incompetent to make his own health care decisions, as required by its terms. Regardless of the representations made by Rankin at the time of her execution of the contract, on June 22, 2015, Brinton Woods' physician evaluated Mr. Charles, finding him to be "alert and oriented" and competent to make health care decisions.[10] Brinton Woods, therefore, was on notice that the advance directive was not yet in effect and that it would be necessary for Mr. Charles to affirm Rankin's authority or ratify the admission contract and its provisions. *See Tower Oaks Blvd., LLC v. Procida*, 219 Md. App. 376, 405 (2014) (under agency law, "when an actual or apparent agent purporting to act on behalf of a principal did not have authority to act, the principal later may approve the unauthorized act" (citation omitted)). Mr. Charles' apparent acquiescence of the admission contract, by moving into the facility, does not mean he has ratified the terms of the contract, unless he was made aware of the

---

[10] The "Physician Certification Related to Medical Condition, Substitute Decision Making, and Treatment Limitations" form contained conflicting reports of the level of competence. Under the section for the "Certification of Ability to Comprehend Information and Make Decisions," while all the boxes checked signified that Mr. Charles was "able" to make his own decisions, the physician also checked the box determining that Mr. Charles was incapable of making informed decisions about "All medical treatments …."

arbitration clause and still took no action.[11]  On this record, we cannot find competent support for the circuit court's conclusion that Rankin was Mr. Charles' apparent agent.

Accordingly, we conclude that, absent actual or apparent agency with the authority to execute an admission contract that included a waiver of jury trial rights, there is no valid or enforceable arbitration agreement.

## 2. Unconscionability

Even were we to assume that a valid and enforceable arbitration agreement between Brinton Woods and the decedent's estate existed, there is evidence to support a conclusion that the provisions contained therein are so one-sided as to present an issue of unconscionability.

An arbitration agreement is "valid and enforceable, and is irrevocable, *except* upon grounds that exist at law or in equity for the revocation of a contract."  Md. Code (1974, 2013 Repl. Vol.) Courts and Judicial Proceedings Article, § 3-206(a) (emphasis added). Which means, "contract defenses, such as … unconscionability, may be asserted in court to invalidate an arbitration agreement."  *Henry v. Gateway, Inc.*, 187 Md. App. 647, 658 (2009) (citation omitted).  "A court may also consider issues relating to the making and performance of the agreement to arbitrate, … [but] [t]he burden of demonstrating these defenses is on the party opposing arbitration, and these issues are often fact-intensive."  *Id.* (internal quotations and citations omitted).

---

[11] The Restatement provides that "[i]f, at the time of affirmance, the purported principal is ignorant of material facts involved in the original transaction, and is unaware of his ignorance, he can thereafter avoid the effect of the affirmance."  Restatement (Second) of Agency § 91(1) (1958).

15

As to the question of unconscionability, the circuit court wrote:

> The Plaintiff [sic] cites [sic] several cases from outside Maryland where arbitration clauses were found unconscionable. However, in *Walther* [*v. Sovereign Bank,* 386 Md. 412 (2005)], it seems clear that the Maryland Court of Appeals requires this Court to "consider whether the terms in the arbitration clause are so one-sided as to oppress or unfairly surprise an innocent party or whether there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause."
>
> * * *
>
> This Court finds that in the instant case the terms of the arbitration clause are not one-sided and do not create an imbalance in each party's obligations and rights. The Court does not find unconscionability ….

(Quoting *Walther*, 386 Md. at 431).

In reaching that conclusion, however, the circuit court provided no factual support for its finding. Rather, the court merely concluded that it "does not find unconscionability." The Estate argues that the circuit court "committed reversible error by not engaging in any meaningful analysis in support of its holding …." We agree and explain.

There are two aspects of unconscionability – procedural and substantive – both of which must exist for a court to decline to enforce an arbitration provision. *Doyle v. Fin. Am., LLC*, 173 Md. App. 370, 383 (2007).

Procedural unconscionability "concerns the process of making a contract and includes such devices as the use of fine print and convoluted or unclear language, as well as deficiencies in the contract formation process, such as deception or a refusal to bargain over contract terms." *Stewart v. Stewart*, 214 Md. App. 458, 477 (2013) (internal quotations and citation omitted).

16

Substantive unconscionability, on the other hand, "refers to contractual terms that are unreasonably or grossly favorable to the more powerful party and includes terms that attempt to alter in an impermissible manner fundamental duties otherwise imposed by the law[.]" *Stewart*, 214 Md. App. at 477-78 (internal quotations and citation omitted). They are "provisions that seek to negate the reasonable expectations of the nondrafting party, and terms unreasonably and unexpectedly harsh … having nothing to do with … central aspects of the transaction." *Id.* at 478.

Despite the "fact-intensive" nature of disputes concerning the validity and enforceability of arbitration agreements, the circuit court made no factual determinations in support of its decision, or to adequately explain its rationale.

### Procedural Unconscionability

The Estate argues that the arbitration agreement in the admission contract was both procedurally and substantively unconscionable, thereby rendering it unenforceable. It also contends that "there is no dispute [that] the arbitration agreement is a contract of adhesion and was the product of procedural unconscionability." Additionally, the Estate claims that "the mediation/arbitration agreement is one-sided, solely for Brinton Woods' benefit, and presents an egregious imbalance of obligations and rights."

In response, Brinton Woods contends that "the rights are equally applied" and "the risk is borne by both parties to the Admission Contract." Further, that "Appellants' arguments in this case do not suggest unique problems with the arbitration clause at issue in this case; rather, the elements the Appellants contend are unconscionable exist in virtually every arbitration clause." Brinton Woods also asserts that "[i]rrespective of the

17

forum, parties face costs, hurdles, and inconveniences, but the purpose of arbitration is to provide alternative benefits to litigation, such as the liberal rules of evidence, which often leads to speedier resolutions ...."

The language of the admission contract reveals either imprecise drafting, which is supported by the numerous errors contained throughout, or a deliberate attempt to mislead an inattentive reader.

The Estate argues – and we agree – that the documents constitute a contract of adhesion. The Court of Appeals has defined a contract of adhesion as one "that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms." *Walther*, 386 Md. at 430 (quotations and citation omitted). The contract at issue was drafted by Brinton Woods and presented in standard form. As we shall note, an imbalance leans heavily in favor of the drafter.

The initial paragraph of the admission contract provides misleading information about what an applicant will find in its contents, stating that: "This contract contains *your financial obligations*, as well as *your rights as a Resident* of this Facility." (Emphasis added). This language fails to inform applicants that the contract also contains an additional provision that is neither a financial obligation nor a right as a resident – the waiver of the constitutional right to a jury trial. Similarly, under the "Additional Documents" section, the document explains that it's "not possible [in the contract] to cover everything that is important to your stay ...." so "additional important documents [are attached] as Exhibits." Although the admission contract provided that those "Exhibits are

18

part of this Contract[,]" none of those documents are included in the record. Furthermore, despite the ambiguous language of the mediation and arbitration clauses, and the importance of one's constitutional right to a jury trial, no "additional important documents" concerning those provisions were included with the contract.

Procedural unconscionability is also evident from the format of the document and the location of the mediation and arbitration clauses within the contract. These two sections are simply numbered paragraphs that are presented in the same format as every other provision. Neither of these two sections contain any apparent emphasis by either bolded, underlined, or italicized language, as is apparent in other sections, denoting important provisions or concepts. The failure to highlight the binding nature of mediation and arbitration clauses or the significance of what the applicant is being compelled to waive, supports a finding of a procedural unconscionability. *See Walther*, 386 Md. at 445.

**Substantive Unconscionability**

Addressing the claim of substantive unconscionability, the Estate avers generally that "there is no mechanism or procedure for how the mediator is to be selected, who has the right and power to select, how much the mediator will cost, where the mediation will take place or who will pay for the mediator." The Estate also outlines additional factors to support substantive unconscionability, stating that the admission contract "then details its own rules and procedures drafted exclusively by Appellees, including [that] there be a three-person Arbitration Committee, a 'loser pays' provision, evidentiary rules and presumptions if the matter is pursued in State Court, and waiver of all appeal rights[,]" as well as a $1,000 deposit requirement.

19

The significant difference between the arbitration clauses in *Walther,* and those before us, appears in the clear and informative language of the *Walther* clause, as well as its location and format. The *Walther* Court noted that it was "loath to rescind a conspicuous arbitration agreement[,]" 386 Md. at 444, pointing out that the agreement in that case "appeared as part of the underlined and distinct arbitration clause, which was located immediately above petitioners' signatures[.]" *Id*. at 445. The Court recognized that the arbitration clause included express language emphasizing the binding nature of the clause and of the waiver of a right, providing that "[t]he parties acknowledge that they are waiving their right to jury trial by consenting to binding arbitration." *Id*. at 419, 443 n.10 (quoting the Disclosure Agreement). Based on those observations, the Court concluded that, "[b]ecause the jury trial waiver was not presented in the Disclosure Agreement in an inconspicuous manner, … we hold that the jury trial waiver did not unfairly usurp the fundamental right to a jury trial from petitioners." *Id*. at 445. Such is not the case here.

The binding nature of the Brinton Woods arbitration clause and the waiver of the right to a jury trial lack clarity and transparency. In addition to the misleading statement in the first paragraph of the admission contract, *supra*, the mediation and arbitration provisions, are also unclear and misleading. The contract imposes an initial mediation requirement, prior to any issue being submitted to arbitration. In addition to failing to provide any criteria for selection of mediators or scheduling and timing details of a mediation, the provision fails to address the allocation of fees or costs associated with the mediation requirement. The contract then imposes a requirement that any issue left

20

unresolved in mediation, must be submitted to arbitration. Moreover, the language of the arbitration clause lacks clarity and includes apparent conflicting provisions.

For instance, the language concerning the arbitration process provides that it will be "consistent with the American Arbitration Associate [sic] rules." Next, the clause includes a requirement that the parties abide by any decision made by the undefined "Arbitration Committee" and that each will consent to such a decision being made by a "majority of the subcommittee of three (3), appointed to act in this case." Not only is the "Arbitration Committee" not defined, the clause also introduces the undefined "subcommittee of three (3)," a term not again referred to in any other section. It is that group who would be the arbiters of the dispute. It is not until section D of the arbitration clause, that the word "binding" is used for the first and only time. Section D provides that "[t]he findings of the Arbitration Committee shall be as binding on us … as would be a decision of Court of Last Resort of the State of Maryland."

The last two paragraphs of section D appear to present conflicting rights and obligations. The first paragraph suggests that a party who loses in arbitration can "decide to then submit this matter to a State Court for its consideration," requiring the losing party to pay the court costs and attorneys' fees of the winning party during the state court proceeding. However, in the paragraph that follows, it states that "the judgment shall not be appealable and shall not be stayed[,]" using the term "judgment" for the first and only time.

It then provides that if

21

the party against whom the decision is made shall appeal from any such decision or file or cause to be filed a Complaint 3 [sic] with any State Court *after the issuance of the Arbitrators' findings*, … [that party] agrees, without questions [sic], to pay and be responsible for paying any and all Court costs, attorneys' fees and/or any cost incurred by the [other party] regardless of the outcome of the litigation.

(Emphasis added).

We find those conflicting statements to create ambiguity. In nearly every instance we can imagine, Brinton Woods would be considered a sophisticated party and the patient an unsophisticated party. A reasonable person – particularly a lay person – would not easily understand his or her rights and responsibilities under the contract. Such errors and ambiguities likewise support a finding of procedural as well as substantive unconscionability.

The contract also lacks detail of the procedures and cost allocation for the alternative dispute procedures. Other than the initial $1,000 deposit requirement, refundable only if the patient prevails, there is no guidance offered to reflect even an estimated range of potential fees and costs. The gaps of important information in those provisions afford the drafting party the ability to fill those gaps freely, thereby "impair[ing] the integrity of the bargaining process …." *Freedman*, 190 Md. App. at 209. It is evident that "there exists an egregious imbalance in the obligations and rights imposed by the arbitration clause." *Walther*, 386 Md. at 431.

Further, an applicant for admission who may lack the ability to produce a $1,000 arbitration deposit may be put in a position to forego pursuit of arbitration. The requirement of a loser-pays-all provision, without estimate of cost, likewise has the

22

potential to preclude recourse for a patient who lacks the financial resources to engage the arbitration process.

### III. CONCLUSION

We find that the record does not support the circuit court's finding of apparent agency. Hence, the Estate is not bound to the mandatory arbitration provisions of the admission contract. Alternatively, we find the terms and conditions of the arbitration clause to be overbearing and, as such, unenforceable as unconscionable.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED; CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS. COSTS ASSESSED TO APPELLEES.**

23